matt.singer@hklaw.com
jessica.brown@hklaw.com

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | | |
|---|---|---|
| ANCHORAGE SCHOOL DISTRICT, | ) | |
| | ) | **COPY** |
| Appellant-Respondent, | ) | Original Received |
| | ) | |
| v. | ) | JUN 3 0 2017 |
| | ) | Clerk of the Trial Courts |
| | ) | |
| M.G., a minor and his parents Betsy | ) | |
| and Brian Goudreau, | ) | |
| | ) | |
| Appellees-Petitioners. | ) | |
| _____ | ) | Case No. 3AN-17-07583 CI |

DEED Case No. HR 17-09

## NOTICE OF APPEAL OF FINAL AGENCY DECISION

Appellant Anchorage School District ("ASD"), by and through its counsel of record, Holland & Knight LLP, and pursuant to Alaska Rule of Appellate Procedure 602(a)(2), hereby appeals to the Alaska Superior Court from the final agency decision of Hearing Officer Sheila Gallagher of the State of Alaska Department of Education and Early Development ("DEED"). A copy of the Hearing Officer's special education due process hearing order is attached to this Notice as Exhibit A.

DATED at Anchorage, Alaska this ___30___ day of June, 2017.

HOLLAND & KNIGHT LLP
Attorneys for Appellant-Respondent

By:_____
Matthew Singer
Alaska Bar No. 9911072
Jessica M. Brown
Alaska Bar No. 1405030

**HOLLAND &
KNIGHT LLP**
601 West Fifth Avenue
Suite 700
Anchorage, AK 99501
Phone: (907) 263-6300
Fax: (907) 263-6345

CERTIFICATE OF SERVICE

I hereby certify that on the 30ᵗʰ day of
June, 2017, a true and correct copy of
the foregoing was served by email and
U.S. mail, postage prepaid, certified,
return receipt requested, upon the following:

Sheila Gallagher, Hearing Officer
200 West 34th Avenue, PMB 774
Anchorage, AK 99503
Email: sheilagallagher1948@yahoo.com

Jacob Kammermeyer
Mark Regan, Legal Director
Disability Law Center
3330 Arctic Boulevard, #103
Anchorage, AK 99503
Email: jkammermeyer@dlcak.org
Email: mregan@dlcak.org

and by U.S. mail, postage prepaid, certified,
return receipt requested, upon the following:

Dr. Michael Johnson, Commissioner
Alaska Department of Education
 & Early Development
PO Box 110500
Juneau, AK 99811-0500

Jahna Lindemuth, Attorney General
Office of the Attorney General
P.O. Box 110300
Juneau, AK 99811-0300

Jeanine M. Huston

HOLLAND &
KNIGHT LLP
601 West Fifth Avenue
Suite 700
Anchorage, AK 99501
Phone: (907) 263-6300
Fax: (907) 263-6345



STATE OF ALASKA DEPARTMENT OF EDUCATION AND

EARLY DEVELOPMENT SPECIAL EDUCATION DUE PROCESS HEARING

BEFORE SHEILA GALLAGHER HEARING OFFICER

IN THE SPECIAL EDUCATION
MATTER CONCERNING STUDENT M.G.
A STUDENT IN THE ANCHORAGE SCHOOL
DISTRICT

DEED CASE - HR 17-09

## INTRODUCTION

On January 7 , 2017, Jacob Kammemeyer of the Disability Law Center on behalf of MG and his parents requested a special education due process hearing involving the Anchorage School District. The State Department appointed me as the hearing officer in this matter on January 30, 2017. ASD filed their response on January 27, 2017.

Resolution efforts were made by the parties, previous mediation having been held and after a resolution meeting on February 10, 2017, I was informed that it did not appear that further resolution efforts would be productive. Several pre-hearing and status conferences were held, February 17, 2017, March 9, 2017 and again March 17, 2017. A Settlement conference had been requested by the parents during the conference on March 9, 2017 but was subsequently rejected by the District. There were several pre-hearing motions filed 1) A Motion to Disqualify ASD's counsel and 2) a Motion by ASD for additional evaluations, both of which were denied. At the pre-hearing-status conferences the hearing dates were set and the times set for exchange of witnesses lists and exhibits. The hearing was held at the Disability Law Center conference room on April 13th and 14, April 17 through 21 and April 24th through 26, 2017. Transcripts were prepared and post-hearing briefs were filed on May 22, 2017. A motion for the extension of the forty-five day timeline for decision was made by both parties and ordered. There was good cause for granting the extension. The hearing dates were complicated by the spring break of the ASD and the spring break of Perkins which unfortunately did not coincide. Also because of the length of the hearing, additional time was necessary for preparation of the transcripts and therefore the time for preparation of briefs was extended. The decision time was extended to allow the hearing officer eight days from the date of the filing of the briefs as the hearing officer was attending her grandson's graduation from Georgetown Law School and that was not to be missed.

## ISSUES

1) Did the District fail to timely implement student's IEP by failing to select an appropriate residential placement for him and

2) Did the District fail to provide FAPE to MG in a timely manner prior to his parents seeking enrollment at Perkins School for the blind
3) Is Perkins an appropriate placement?

## RELIEF SOUGHT

The parents in the request to the State Department of Education asked that ASD be required to pay for student's tuition at Perkins School For the Blind as well as any additional costs associated with his admission, including travel and related expenses necessary for him and his parents. The parents also initially asked that the length of residential placement be determined by the staff at Perkins and that student should be awarded additional time at Perkins as compensatory educational services in an amount equal to the time he has been deprived of special education and related services in a residential placement as required by his IEP; by parents' calculations, eleven months of compensatory education. The concept of compensatory education was not developed at the hearing and the parents' clarified that their request was for one summer program (ESY ) and one school year at Perkins to be paid by the district together with travel costs for 2-3 trips for two people plus student. In their closing brief, parents asked for the remaining 2017 school year at Perkins, student began May 1, 2017, ESY this summer and the full school year next year. This was less than the mother had referenced in her e mail to Laura Allen EX P 63, page 30 when she included ESY for 2018. I am going to assume that the balance of 2017 school year, 2017 ESY and 2017-2018 school year, not including ESY 2018 is their request for relief. This would include reimbursement for the deposit parents made at Perkins and their reasonable travel costs.

## STATUTES AND REGULATIONS CONSIDERED

4 AAC 52.550(i)(11), 34 CFR 300.502 (c)(1), 20 U.S.C. Section 1412,(a)(10)(C)(iii)(III), 34 CFR 300.148(d)(3), 20 U.S.C. 1400(d)(1)(A), 34 CFR Section 300.323(c)(2), 34 CFR Section 300.116, 334 CFR Section 300.104, 4 AAC 52.140(e), 34 CFR 300.154(b)(2), 20 USC Section 14101(9)(D), 20 U.S.C. Section 1412(a)(10)(C)(ii)

## WITNESSES

For the Parents and Student:

Mother - Betsy Goudreau
Father- Brian Goudreau
Jodi Peters. M.Ed - Perkins School for the Blind teacher
Alexandra Lavoi, M.S. OTr/L - Perkins Occupational Therapist
Andrea Caron, M.S. BCBA - Perkins behavior analysist
Laura Merwin, B.A. - Teacher Perkins
Michelle Englebrecht - Perkins Assistant Education Director

Denise Fitzgerald - Director of Transition at Perkins
Kristen Fraiser - Assistant Coordinator of Residential Living Perkins
Patrick Mc Call - Education Director, Secondary Education Perkins
Cara Leckwold, M.A. CCC-SLP - private speech-language pathologist provider for student

Ruth Ann Hyson- Director of Statewide Outreach Services at the Maryland School for the blind.

For the Anchorage School District:

Jennifer L. White - Able Opportunities, consultant for ASD
Cindy Anderson, - Executive Director, Special Education ASD
Eudora Fraczek - Special Education consultant for ASD
Jose Pabon - Blind, visually Impaired Department ASD
David Kohler - Special Educator, ASD
Chris Sturm - Behavior Analyst ASD
Maureen Harwood - Senior and Disabilities Services, Alaska Department of Health and Social Services
Deb Etheridge - Senior and Disabilities Services, Alaska Departent of Health and Social Services
James Anderson - Chief financial Officer, ASD
Victoria Ackerman - Blind, Visually Impaired therapist ASD
Deba Parrish - Department chair special Education, ASD


## EXHIBITS ENTERED

For Parents - Exhibits marked 1-78 - list attached as A (1)
For Anchorage School District — DA.2 through DI.3 - list attached at B (1)
Joint Exhibits - JT1-JT 16- list attached as C(1)
In addition exhibits D1.4 and D1.5 were introduced and accepted at the hearing.

## FACTUAL BACKGROUND

MG is a student in the Anchorage School District. MG was born, April 21, 1999, one of twins, and has experienced multiple disabilities; moderate to severe cognitive impairment, non-verbal autism, gastrointestinal issues and now in his teenage years the onset of potentially total blindness from bilateral optic nerve damage. He has participated in special education programs since he was in pre-school. His parents, lawyer mother and father, a teacher for ASD, experienced positive relationships with ASD and the Special Education program until student entered West High School. Up until that time student had been a happy, social child, more social than some autism students probably because of his parents use of Floor Time which is a relationship-based intervention program that student began when he was three years old and the parents continued. He relished outdoor activities including participating in snowshoeing competitions in the Special Olympics. He has two siblings, his twin, who was in special education glasses until third grade but now is in regular education, active in sports and pursuing college and his older sister who never participated in the special education program and is now in her third year of college. The family enjoyed outdoor activities, walks and hikes, swimming etc. He did have his gastro challenges, with attendant pain which was complicated by his non-verbal status and these together caused agitation which did affect his functionning in school. In fact his 4/16/2015 on page one ( P. Ex. 20) outlines many of his GI symptoms, pain and accompanying behaviors.

During his first year at West High things did not go well for student. The transition was difficult for him. School started at 7:30. He had a new school, new teachers, new OTs and his sister had left for college. (testimony of mother), also 4/16/2015 IEP. Many of his behaviors that interfered with his ability to function in school returned. As the IEP said, the behaviors are "quite challenging and have been difficult for all who work with student." He has experienced significant regression. His parents began to notice that he was poking at his eyes and ultimately, during the summer, began walking into things. At about the same time that the parent noticed the beginning of this behavior, ASD gave student on March 24, 2015, a vision test, P. ex. 19, which for some unfathomable reason they did not immediately give to parents. This test had showed that student had significant problems with his distance vision in both eyes. The parents not knowing about the vision test consulted with the CBC for assistance with his behavior. Yet in student's IEP of April 16, 2015, on page four, the team referred to suppport of student's visual learning through structures and visual supports which are necessary and critical for student. There was no provision of accommodations for vision loss and in fact most of the goals and objectives in the IEP depended on vision or visual supports. (April 2015 IEP) even though by then the results of the March 24, 2015 vision test should have been known to the team and the parents.

Student's behavior continued to deteriorate including the escalation of violent and aggressive behaviors. Parents in an effort to determine the cause of student's behavior took him to his doctor and as previously noted also consulted with the Complex Behavioral Collaborative for assistance with his behavior. Yet the doctors found no cause or solution to the problems even giving him an MRI. His behavior only continued to deteriorate.

Instead of the ESY services that student normally would have utilized and was offered by ASD, he attended an 8 week summer camp for children with disabilities run by FOCUS. The time at camp per day was longer, the staff is consistent and students did many outdoor activities which student loved. He had participated in focus camps before.(mother's testimony) It was while he was at camp that he began running into things. It became apparent it was not just the eye infection he had had previously but something more serious that was causing this behavior and possibly his other more aggressive behaviors.

Parents had taken student to Dr. Arnold a local opthamologist who treated his eye infection which parents had thought caused the poking but Dr. Arnold did not initially diagnose the vision loss. After the reports from the camp personnel, student's parents returned to Dr. Arnold in August of 2015. At that time, Dr. Arnold diagnosed significant vision field loss. His prospective diagnosis was retinitis pigmentosa which would eventually lead to total blindness and oftentimes hearing loss as well. He also referred them to Dr. Robert Enzenaur at the Pediatric Ophthalmology Clinic at the Children's Hospital in Denver who in December, 2015, after a thorough exam including a four hour exam under anesthesia, gave them the terrible news that it was not retinal function but that student had progressive bilateral nerve damage, optic nerve atrophy, which would potentially result in total blindness in a fairly short period of time.

Student's parents shared Dr. Arnold's diagnosis of severe visual disability with ASD in August 2015, before student began his second year at West High and sought to have a program developed for him at West High. The information was intially given to Jose Pabon, a BVI teacher with the District. Mr. Pabon contacted Victoria Ackerman the BVI teacher at West High and Kaleb Kuehn, student's special education teacher. Student had always depended upon his sight as he was non-verbal and had used an iPad, dynabox, and other tools to communicate. As

Cara Lethwold, his private SLP testified, he never had tactile skills so it would be necessary to change him from vision orientation to tactile and as she also said it "needed to be a mad dash" before his vison was lost." The program at West High consisted of 30 minutes a week with the vision impaired teacher, Ackerman, who instructed student in the use of a cane. That was for safety concerns among other reasons and nothing that follows is to be construed as impugning the value of that. She provided no special education or vision rehabilitation services. According to Miss Ackerman, who testified at the hearing, there was also an attempt to provide tactile aids for student in the classrooms although this was not done by her. Tr. 1870. Ms. Ackerman also testified that from August of 2015 through April 7, 2016, she performed a functional vision assessment of student which showed his vision was "dropping" rapidly. This was not shared with the parents nor were progress reports shared with the parents until the May 2016 IEP (Tr. 1866). There was differing testimony on the ability of Ms. Ackerman to assist studente, she stating in testimony that she could develop a progam for him ( her testimony reflects nothing beyond teaching cane skills) and his father, a teacher at West, stating that Ms.Ackerman had told him she did not know what to do for student. Also see Tr. 1862 where Ms. Ackerman reported difficulty assessing student. Interestingly, neither side called Mr. Kuehn, student's main special education classroom teacher as a witness. Mr. Kuehn, according to student's father, told him that
Ackerman was doing just O&M and not doing any adaptation in the classroom.  Jennifer White , the ASD  private consultant gave examples in her testimony of things to be done to utilize student's remaining vision and prepare for less vision. Ms. Ackerman did little to none of these. The May 18, 2016 IEP (P. ex. 33) had four pages of suggestions for coping with student's vision loss. These were developed without the benefit of his evaluation at Perkins which was not received by the ASD until after the IEP was completed.  They did not contain examples of concrete instruction and direct training in tactile skills. If they had had the Perkins evaluation prior to the meeting, the report might have contained some of Perkins suggestions. Also it is clear from the testimony of Jennifer White that she would be able to assist in implementing the Perkins suggestions.

Mr. Pabon  testified that he had worked with childen with multiple disabilities, autism and blindness since 1991 and has been employed with ASD as a teacher of the blind and visually Impaired since 2003. He reviewed the Perkins report on student and said that ASD could do all of the techniques if ACE/ACT and Life Skills programs were included and pointed out that BVI teachers worked with OTs. However he never worked with or taught student. He had no supervisory role over BVI teachers including Ms. Ackerman. Student never came up in his staff meetings. He received the vision assessment on student in the fall of 2016 and gave Dr. Arnold's report to Ms. Ackerman. He however has no first hand knowledge of what she, or anyone else, did with student and did not know if she did do a vision assessment. In other words his testimony was his opinion about what ASD could do with student but not what ASD did do with student.

After the parents considered 2015-16 to be a "lost" year at West, they began to search for schools or other alternates which could help student learn to live with his blindness. One of the schools that they had located was Perkins School for the Blind in Watertown, Massachusetts. which was a residiential school that specialized in children with vision issues and was also equipped to deal with student's autism and gastrointestinal and other dietary issues. This is not where they started however. First, student's mother contacted different services for the blind in Alaska but they could not provide services for him because of his autism and other disabilities. She then moved to Washington contacting the Washington School for the Blind and the Helen

Keller Institute. Neither of these schools could assist student and both of these schools recommended that they contact Perkins School. Washington School for the Blind also recommended the Texas School for the Blind and the Maryland School for the Blind. Texas did have a residential program for children in student's situation but they did not take out-of-state students. Maryland was only Monday through Friday and students would have to make other arrangements for weekends and holidays. This was also the situation with Nebraska another well regarded school for the blind. All together between the fall of 2015 and the fall of 2016 between the efforts of the ASD and the parents, twenty-five schools were contacted.(See Joint Exhibit 10 ) By process of elimination it came down to either Perkins School or Maryland with ASD also in the fall of 2016 stating that perhaps student did not need a residential placement but could be served in the ASD. But discussion of that will come later.

After the evaluation in Denver in December of 2015, parents had realized that time was not on their side in dealing with student's problem. They contacted the Disability Law Center and in January of 2016, Anne Applegate, at that time an attorney with DLC, contacted the ASD requesting that ASD pay for student to be evaluated at Perkins. Mother had put student on the waiting list for an evaluation in the fall of 2015. ASD promptly agreed to the evaluation not committing however to his attendance there only his evaluation. Perkins evaluated many students who did not attend their school and this was not unusual. Even though student had been on the waiting list, he was still not able to be evaluated until March of 2016. Some of this delay was in part because of his father's teaching schedule. Parents and student flew to Massachusetts for the evaluations and to see for themselves whether the school would be appropriate for him. The evaluations were done March 15 and 16th, 2016 and the final report was received by the ASD on May 18, 2016. At the time of the evaluations, parents also began an admissions process for student.

At the IEP meetings in 2016, April 28, May 11 and May 18th, the IEP team agreed that student needed a residential placement to assist student in making the transition to living as a blind person. Ms. Ackerman agreed with that recommendation., her testimony and P 33 where it states that the "the team reached full consensus on residential because of the nature and severity of student's disability. " Page 25 of Exhibit P 33. The parents left the IEP meeting believing that student would be attending Perkins however the IEP team did not specify Perkins and said the location of the residential placement was to be administratively determined.

Perkins is a very expensive school, $1388.77 per school day not including transportation costs (Exh. DG 4) and does not accept Medicaid payments so the funding would be the responsibility of the ASD or the parents. It does include room and board in the residential program for all seven days of the week while school is in session. The tuition for the 2017-18 school year at Perkins, including the regular school year and ESY is $290,392.75. (Ex. P.74) The ASD would receive approximately $77,000.00 (based upon this year's funding) of State government funding as student is classified as intensive needs. This money could be used to defray part of student's tuition however it would not go directly to Perkins but to ASD 's general fund, per Cindy Anderson and James Anderson Chief financial Officer of the ASD (TR. 1639)  The balance of the tuition ($213,000.00) and related costs, would also come from ASD's general fund. Perkins would be the most expensive school that ASD had ever funded ( per Special Education Director Cindy Anderson and Special Education consultant Eudora Fracyk Tr. 1518, 1947)) so the school district and the parents began a search to see if there were a suitable alternate. Actually the parents continued their search and the ASD began its search. There were

some schools for the blind that would not accept out-of-state students, others that could not accept students with autism and the biggest stumbling block, no schools other than Perkins and Arizona provided 24/7 residential placement. Arizona's weekend residents however were self-sufficient and no students have severe autism and none was non verbal. Also Jennifer White, the District's private consultant, after her visit to Arizona, stated in her report, Ex. DE 2 pages 5-6 the school does not offer ESY and Students attending from outside the local region are required to go home every 6-8 weeks. According to the principal Ms. Creasy "If vision is not their primary diagnosis ASDB isn't the right placement." A paraprofessional at the school for 19 years has not had anyone with complex needs for at least the last three years. According to White's report on page 6, most students who attend ASDB either go to college or move into the area rather than transitioning back to their hometown.

After the other schools were winnowed out, Maryland School for the Blind was considered to be a educational, viable option by the ASD. It used the TEACCH curriculum designed for students with autism and had just finished a new facility geared for students with vision impairments and autism. The parents were intially willing to travel to inspect it. It would require student to be in a foster home or similar situation each weekend and short-term vacation and the parents worried that this would be too much of a continual adjustment for him as he, as in common with persons with autism, had problems with transition. Also the tuition at Maryland was approximately $200,000.00/year and there was never any anaylsis presented as to what the cost of the weekend living would be and therefore how Maryland's costs would actually compare to Perkins. The $200,000.00 also did not include the cost of ESY. Maryland does bill medicaid for all related services (DH 1.p.3, Tr. 734) but the costs of the weekend residence could not be billed per testimony from the DHSS representatives, Etheridge and Harwood. Travel costs to Maryland or Masschusetts would probably be similar. The parents however never traveled to Maryland.The process became bogged down for reasons discussed below.

In the summer and fall of 2016, the ASD and the parents operated on this parallel track to investigate schools and alternate placements for student. At least twenty-five schools were considered. There was a mediation session held and a resolution meeting and the ASD made several settlement offers, all of which were rejected by parents, some for good reasons, some because the parents had become firmly entrenched in their belief that Perkins was the only placement that could help their son and because of their concerns over weekend services. Also the interview process and acceptance process for Perkins was lengthy and one of the ASD's proposals was to pay for student to attend from November of 2016 through June, 2017. However Perkins did not have a place for student until May 1, 2017 and there was never another proposal by the district that slid the dates back ie from May 2017 to December, 2017 for instance. Whether the parents would have accepted that is unknown as it was not proposed and it was also unknown how long it would take student to master the skills necessary for him to function as a blind person in a seeing world although a minimum of a year was bandied about and the parents are seeking a full school year and the summer session of 2017. At the time of the offer from November until June, per the testimony of Cindy Anderson, ASD did not know that student could not start until May of 2017. When being informed of this the ASD in a settlement offer proposed $200,000.00 which parents could have used at Perkins. This would be in excess of $100,000.00 less than the tuition costs of Perkins and the travel costs. The costs for the tuition and travel are all over the map which the ASD in its brief states would be tuition of $373,463.38 and travel costs of $51,324.80 for a total of $424,777.18. The tuition costs vary because of the inclusive of the 2018 ESY. The ASD's estimate of travel costs seem premised upon student returning home for each and every break which has not been determined and

does not seem reasonable. Student does require two persons to travel with him. His trip must also be broken up, usually in Seattle, and the food preparations for the trip are formidable. (testimony of mother - student needs special food because of gastro and other dietary issues and allergies)

Because of their dissatisfaction with the program offered to student in school year 2015, the parents made alternate arrangements for student which ulitilized the service of private therapists, a BCBA and SLP and services through the ARC to help him. Interestingly enough Anchorage (beyond the ASD) does not have a program which would help someone like student who was going to go blind and had all of these other disabilities. Mother had checked the Alaska Center for the Blind. I independently checked as well and my findings concurred with that of student's mother.

Also it was ASD's position that student had improved his skills with the services the parents had provided for him in 2016 and therefore he might no longer need a residential placement and would need to be assessed for his current abilities to determine that. There is some irony in that.

The ASD proposed that student in school year 2016-2017 utilize the services of ACE and ACT which would provide student assistance in vocational training so that he could be ultimately independent and somewhat self supporting. Jennifer White would work with parents and ASD to implement the proposed accommodations in the IEE from Perkins. The independence and the ability to hold some type of job has always been a goal of the parents but their position is that student is not yet ready to utilize those services as he needs more instruction in how to function as a blind person. See the father's testimony at Tr. 2278. Also ACE/ACT is premised upon a student completing high school which this student has not. As Matt Niclai stated in his testimony ACE/ACT is a transition program for students who have already completed four years of high school. (Tr 1119). There was no testimony that he would receive specially designed instruction to compensate for his vision loss.

ASD also proposed that student return to West High which the parents rejected because they did not believe that the student could receive the services necessary and because of what they believed were the inadequate services he received in 2015-16. The best indicator of future performance is often past performance and the ASD did not provide student with those services in 2015, 2016 (cane skills only not sufficient) and so the parents were unwilling to rely on ASD.

ASD also offered to provide ten hours of homebound services to student utilizing a district BCBA and BVI teacher for at least two weeks in August. This would happen while the district and parents were in mediation to consider the "mutually selected residential setting." P 76. This was rejected by the parents as too isolating for student. .His services would be limited and he would not be surrounded by peers. His parents put together a program for him that allowed him to interact more in the community and to have consistent therapists.

I have no doubt that ASD could provide an appropriate program for student once he had learned how to utilize his remaining vision and how to cope with his ultimate vision loss. However, as father said, he was not yet ready for the ACT and ACE progam because he had not learned the skills that Perkins could teach him. It is also interesting that the progam that the ASD consultant suggested relied in part with consultation with Perkins and utilization of Perkins strategies. The initial schools that both the parents and ASD contacted referenced Perkins. Perkins braillers are used in many of the schools and Perkins techniques were referenced in the materials of Arizona

School for the blind. Arizona was one of the placements put forward by ASD and Arizona did have weekend residential services. But Arizona requires out of state students to go home very 6-8 weeks (five breaks a school year). And most importantly Arizona does not have any students in their residential progam with student's list of disabilities. There was no discussion of Arizona's abilty to deal with student's challenging gastro and dietary conditions. ASD's brief indicated that the parents turned down Arizona and therefore Arizona did not move forward with the referral process. However, the report of Jennifer White ASD's consultant indicated that Arizona would not be a good fit.

The ACE/ACT program, offered to parents as an in-district placement for 2016-2017, was turned down by parents for the reasons stated above: that the program would not allow student to learn skills with his remaining vision and to adequately prepare for almost total vision loss. This would be a program that would be good for student after he received the training from Perkins.

The October 12, 2016 offer of Maryland School for the Blind was rejected by parents for the reasons stated earlier. In many ways, it was an excellent placement. It had the new building specifically designed with the needs of autistic and blind students. It has a residential program but not on weekends. They use TEACCH and have Ot, PT, speech, BVI, APE, O& M, behavioral specialist, social workers, AT and psychologist services. In other words, everything a student like this student would need. It uses a curriculum based in part on Perkins and Texas School for the blind. But student has the gastro and dietary needs which were not really addressed either in the main program and definitely not in the weekend situation. The weekend situation is Maryland's flaw. Parents do not believe that the continual transition from school to a weekend home would be good for student. The lack of consistency is a problem for student and it takes time to learn his gut issues and his signals for problems. Medicare would not pay for the weekend placement but would pay for related services. (DH!, .3, Tr. 734 )

It is unfortunate that the parents did not at least visit Maryland to see if a weekend accommodation could be found. The parents however are not the only ones to believe that a five day residential program would not be good for student. According to Cara Lethwold, his SLP who has been serving him twice weekly, transition is very difficult for student. He needs consistency. His dietary and health issues need to be taken into account and his small window of time before he's blind. In her opinion, Perkins with its seven day total immersion into the visually impaired is what student needs. Most tellingly, Ruth Ann Hynson of the Maryland School for the Blind said in her testimony that the school cannot assure parents their child's safely in weekend settings. Furthermore skills gained during the week can be lost on weekends with families or in group homes.

On October 12, 2016, ASD also offered to Parents a residential placement at the Nebraska School for the Blind. Like Maryland, Nebraska does not have a residential placement on the weekend and the parents objections to Nebraska were the same as to other schools with no weekend residential program.

On October 24, 2016, ASD proposed to fund student's placement at Perkins from November 1 until June 16, 2017. That was also rejected but because student could not enroll in Perkins until May 1, 2017; there was no space available. Sliding dates were not offered because ASD was unaware of that fact. Whether parents would have accepted that proposal with different dates we do not know. See discussion page 7.

There was much testimony at the hearing as to the reasons why private weekend providers were not researched. According to the ASD it offered to look into ARC and similar providers for weekend care and presented consents for releases of records for that purpose. According to parents, the releases were too broad. They would have been willing to sign releases to specific agencies but not to state or region wide agencies. It was not clear as why more narrow releases were not provided. It may be that on both sides, litigation mode took over.

ASD stated that Perkins is not an acceptable placement for the following reasons: See PWN 8/11/2016 and PWN 9/2/2016 both contained in P. ex. 76.

1) exceptionally high cost. there is no denying that the cost of attending Perkins is high. But there was no specific cost analysis done by either side to show the differences between Perkins and Maryland, ASD's preferred choice of residential placement. Perkins is seven days/week, Maryland 5 days/wk. Perkins is not medicaid, Maryland can bill Medicaid for related services. Maryland would require a weekend and vacation residence for student. This cost would not be covered by Medicaid. Because of student's intensive needs status, ASD would receive $77,000.00 (per this years funding) for his attendance at either school. As previously noted this money goes into the general fund and payment to either school would be made from the general fund. The per day cost of Perkins is known. The per day cost of Maryland is not. The figure of $200,000.00 plus ESY and weekend and vacation services is not outlined. Perkins is probably more but how much more cannot be determined by what was presented at the hearing.

2) Lack of transition services - One of the witnesses for student was Denise Fitzgerald, the director of transition at Perkins. She testified at length Tr. 136 through 160 about the methods Perkins uses to transition students back into their home community. She cites examples of different states to which staff members had traveled to assist in transition and also referenced the school's use of Skype. Perkins intent is reintegration and they work toward that purpose. They cooperate with the sending school district and as she said they would "relish" maintaining contact with student 's local school district. Student's mother also provided the district with all of Perkins materials about transition which showed that they did in fact have such services. In addition, as generalization was a phrase often referenced, it is important to remember and analogize it to transition for as Andrea Caron, a BCBA at Perkins said in a reponse to one of my questions. - "Perkins' goal is to provide them with the skills that they need for life in whatever environment that they're in because it doesn't make any sense to train them to develop skills that are functional only at Perkins.(T. 69-70)

3) As medicaid would not be funding any of student's services at Perkins, there would be no Medicaid oversite as there would be if student went to Maryland. As Maureen Harwood of DHSS testified " with our obligation to the Center to medicaid/medicare comes a lot of oversight, quality assurance, you know process." (TR 1307) However with Perkins, the Massachusetts Department of Elementary and Secondary Education would provide oversight of the implementation of student's IEP at Perkins. Ever three years they do a full comprehensive investigation. They go through students' IEPS. When Perkins is an out of state placement, It has to "comply with all elements of the IEP for the student and shall provide in writing to the administrator of Special Education detailed documentation of such compliance through completion of required student progress reports. The placing school district may monitor and evaluate the education to the student, can get records and can conduct announced and unannounced site visits. (McCall testimony 119-20, JT 16, the June

2015 three year review report, TR 1959-1969. )This to me is a far superior way of making
sure that student's IEP is being implemented.
In addition, student's mother provided ASD with seventy pages she got from
the Massachusetts State Department of Education re oversight.

4) Distance from home - Once west coast and local school program schools were eliminated
and only Perkins and Maryland remained, this is not a factor. Air fare is similar and in both
cases an overnight stay is required so the costs should not be substantially different.


## DISCUSSION OF ISSUES

This is a fact driven case. In all of the cases cited by the ASD and the parents for that matter, no
other student has had the range of disabilities presented by this student. His autism, his
digestive problems, his allergies with attendant problems, his non-verbalism, now his blindness
present challenges rarely faced. Two witnesses for the ASD referenced this in their testimony:
BVI reacher Ms. Ackerman and Cindy Anderson, Special Education director. Neither knew of
any other ASD students with these issues. This made the development of a program for student
particularly difficult and led to the IEP team recommending a residential placement because of
the "nature and severity" of student's disability.

This nature and severity contributed to the difficulty of finding an appropriate residential
placement. Many of the twenty-five or more schools investigated by ASD and the parents had
good progams for students with vision issues but they were not seven day residential facilities,
they only took instate students or they did not deal with autism. Arizona, Nebraska, Maryland
and Perkins were the schools that made "the final four".

Arizona had a good program and a seven day residential program. According to the ASD,
parents torpedoed Arizona by telling the school it would not be a good fit. However, the ASD's
own consultant Jennifer White found that the Arizona weekend residential students were self-
sufficient and did not have the range of disabilities that this student has. Other testimony from
the principal and from staff at Arizona indicated that vision loss was their primary function and" if
that was not the diagnosis, Arizona was not an appropriate school." According to one staff
member, there had not been a student with such a range of disabilities for more than three
years. Parents had made full disclosure of all of student's disabilities which may inadvertently
not have been done by ASD, hence ASD's opinion that Arizona was a good fit.

Nebraska had a good program but was not a seven day residential program. It is in a more rural
area and the indication was that weekend facilities for student might be difficult to obtain.
The advantage of both Nebraska and Arizona was their cost which in each case was
significantly less than that of Maryland or Perkins.

It then came down to Maryland and Perkins, the District's other options not included because
per previous discussion, they were not acceptable to the parents and they did not fit within the
IEP direction of a residential program and did not fully address student's needs.
Maryland has by all accounts an excellent program with a new facility designed with the needs
of an autistic and blind student in mind. If it were a seven day residential facility, it may have
been the parents' choice. However, it is not. Student would be required to live in some type of

foster home environment on weekends and during vacation. According to the Maryland principal, while they had a list of homes available they could not guarantee student's safety. In addition student is non-verbal and could not articulate safety concerns. He has a list of digestive and other problems that would make a weekend home's job difficult at best. Also there is the issue of continuity and the problems with transiting from school to the facility each weekend. Maryland too is very expensive, estimated at $200,000.0 per year not including ESY and the costs of the weekend residences. It may not be much, if any more expensive than Perkins when everything is factored in but those figures were not presented by either side; the cost of ESY and an estimate of weekend residence.

Cost should be considered and is allowed to be considered if the programs are both appropriate and comparable. Here the educational programs are comparable but the other factors are not. I cannot in good conscience send a student with this student's disabilities to a school that does not provide a safety net and Maryland does not as it does not have the capability of weekend housing or even monitoring student's weekend housing.

Student is entitled to a free, appropriate education not the best education, not the Cadillac. If any of the other schools with the good programs, ie Arizona, Nebraska, Maryland had weekend residential or were equipped to handle student's problems (i.e. Arizona), Perkins would be disqualified because of its cost. But there are no other schools that provide all of the services that student needs and no other school where it has been demonstrated that he can be taught to live as a blind person in a seeing world and where he will be immersed 24/7 in that world. Perkins by the preponderance of the evidence presented will help him transit back to his home environment. All of the other schools referred to Perkins almost as the holy grail of a school for the blind who can also handle other disabilities. It is not only the best choice but in this very particular circumstance it is the only choice for this student.

Both ASD and the parents acted in good faith in their search for a placement for student. It is an administrative decision but it must be an appropriate one. Cost was a stumbling block and a reasonable one. ASD has many students and the budget must cover all of their needs to the extent possible. I do not fault them for investigating all alternatives. We did at the hearing and certainly attempted to find additional sources of funding to relieve some of the burden.

The ASD has argued that parents' request if granted be at least reduced because of the ASD's position that the parents thwarted any efforts to find a reasonable alternative to Perkins. I did not see and do not find any evidence of that by parents. Student's mother was tireless in her efforts to get information about opportunities for her son. She shared her information with ASD staff, at least until she was directed to refer everything to ASD's lawyer. Parents would have investigated Maryland but got caught up per a series of e mails, in the "communicate through attorneys" and therefore the visit was not made. (P. ex. 63, page 16.)

The issue re consents was addressed earlier. Parents reasonably I believe wanted narrow releases drawn so that their son's information would not be shared indiscriminately. Narrow consents were not provided. There appeared to be some issues of trust on the behalf of ASD toward parents' previous lawyer which may have contributed to the problem and of course the specter of litigation was hanging over both parties. I also do not judge mother's actions in the context of "she is an experienced lawyer". In this case she was acting as a concerned mother.

ASD also requested consents to evaluate student in the fall of 2016 and made a motion for evaluations prior to the hearing . This motion was denied and the parents objected to evaluations that were additional to the one that was done by Jennifer White in the fall of 2016. ASD had had multiple opportunities to evaluate student prior to the fall of 2016 and immediately prior to the hearing. They had not evaluated him after their own staff found that he had failed a vision test in March of 2015. They did not even inform parents so that they could have had him evaluated. They did not do an evaluation of student after they were supplied with the report of Dr. Arnold although Ms. Ackerman did from August of 2016 to April of 2017 a running evaluation of student although she did not inform parents of what she found untilt the IEP meeting in spring of 2016. The IEP team did not suggest or request additional evaluations prior to the recommendation of the residential placement.

## CONCLUSIONS OF LAW

The party that requests a due process hearing has the burden of proving the party's claim by a preponderance of the evidence. 4 AAC 52.550(i)(11). The parents have met the burden that the ASD failed to implement student's IEP in a timely manner by not selecting a "safe and apropriate residential placement".

## ORDER

1.There is no magic number, at least one that was presented at the hearing, as to how long student would need to attend Perkins to achieve the skills he would need to transition to living as a blind person. A year was bandied about but it all depends upon the individual. I hereby order that ASD will pay for the period (the billable days) from May 1, 2017 through February 17, 2018. This will include reimbursement to the parents for any deposits they have paid for that time period to whatever the last day of school is during the spring break in February. In 2017 the break began February 18th. This will give student nine and one-half months of instruction or approximately 169 days at Perkins. The current daily rate for Perkins is $1388.77.

During student's attendance at Perkins, ASD representatives and Perkins staff will work to complete a new Administrative ESER and IEP. Because of the advent of ASD summer holidays, when some staff is not normally available, the time to develop the IEP will be extended to on or before October 1, 2017. The new IEP will cover the period through the school year, 2018-19. The parents will agree to take all reasonable steps to facilitate collaboration with Perkins and provision of needed information from Perkins to ASD or its consultants.

Some of the terms of the Settlement offer Exhibit JT 11 presented in October of 2016 are relevant to this Order and are incorporated in part with changes in dates and some added provisions. A copy of this Settlement Offer, with noted changes is attached as appendix 1 to this Order.

It is my hope that the parents, Perkins staff and ASD staff and their consultants can and will before February 17, 2018 collaborate on the evaluation of student to determine if he is ready  to

return to ASD or would benefit from increased time at Perkins. In fact they must determine by February 17, 2018 whether he can return to ASD. All have an interest in this but I do not order that Perkins alone can determine the amount of time that student requires as was requested by the parents. ASD has expertise and the evaluations that ASD and Perkins will do should provide an objective standard to determine if student is ready to return to ASD or needs to remain at Perkins. If there is a disagreement, parents will have their rights under the IDEA to pursue a remedy. I selected the date of February 17, 2018 deliberately. This gives student time to be evaluated and if he is returned to ASD he can begin services after the 2018 spring break. This will give ample time for him to transit back to ASD and for arrangements to be made for his services before school at ASD starts again on March 19, 2018.

2. Parents shall be entitled to reimbursement for three round trips between Perkins and Anchorage to cover the reasonable cost of tranporting students to Perkins, air fare and related expenses, hotel, car. It was established at the hearing that it is necessary for two persons to assist in the transport ot student to Perkins and that the trip must be broken up so that two days of travel are necessary therefore lodging is required. The two individuals, in addition to the student, may be the parents or whomever the parents may contract to assist in student's transport.

3. Parents will not be entitled to any compensatory education for student.

4. The Disability Law Center did not ask for the award of attorneys' fees in this matter either in the original request or in the closing brief. This matter may be brought up in a separate motion.

## APPEAL RIGHTS

In accordance with AS Section 14.30.193 (f) and 20 USC Section 1415(1)(A), this is a final administrative order. it is subject to appeal to the Superior Court of the State of Alaska in the manner provided under AS Section 44.62.560 and the applicable rules of court. Any appeal may also be taken pursuant to 20 USC Section 1415(i)(2)(A) and 34 CFR Section 300.512 and tjthe applicable federal rules.

Dated this 30 day of May, 2017.

Sheila Gallagher

Sheila Gallagher
Due Process Hearing Officer

Certificate of Service

This is to certify that a hard copy of
the above hearing Decision and Order was mailed on May 31,
2017 and e mailed to the following:

Jacob Kammermeyer -Disability Law Center for the parents
Mark Regan -Disability Law Center for the parents
Susan Sonneborn -Jermain, Dunnagin & Owens for the ASD
#e mail May 31, 2017 hard copy with attachments and appendix mailed June 3, 2017

Sheila Gallagher Lawyer LLC
Hearing Officer for HR No. 17-09
200 West 34th Ave., PMB 774
Anchorage, Alaska 99503
Telephone: (907) 276-1641
E-Mail: sheilagallagher1948@yahoo.com

Re: Due Process Hearing Request 17-09

**STUDENT'S EXHIBITS**

COMES NOW, M.G., by and through his parents, Betsy and Brian G., and counsel, Disability Law Center of Alaska, and hereby notifies the Anchorage School District that the following documents may be offered into evidence at the Due Process Hearing in this matter:

**Reports, Assessments, Evaluations, Treatment Records, Care Plans & Provider Letters**

| | |
|---|---|
| Exhibit P 1 | Perkins School for the Blind Evaluation Report, March 15-16, 2016 |
| Exhibit P 2 | Perkins School for the Blind Information and Paperwork |
| Exhibit P 3 | Letter from Dr. Phyllis Kiehl, Latouche Pediatrics, LLC, June 3, 2015 |
| Exhibit P 4 | Treatment Records from Alaska Children's Eye and Strabismus |
| Exhibit P 5 | Providence Alaska Medical Center Moderate to Deep Pediatric Sedation/ Anesthesia Pre-Assessment Record, October 1, 2015 |
| Exhibit P 6 | Letter from Dr. Robert Enzenhauer, Pediatric Ophthalmologist, Eye Center, Children's Hospital, January 29, 2016 |
| | Expanded Core Curriculum for Blind and VI Children and Youths Informational Packet |
| | Physician Letters from Betsy and Brian G., September 2015 |
| Exhibit P 7 | Letter from Phyllis Kiehl, Latouche Pediatrics, LLC, March 3, 2016 |
| Exhibit P 8 | See Joint Exhibit 1 |
| Exhibit P 9 | Speech and Language Updated Plan of Care, Pediatric Speech-Language Services, April 15, 2016 |



|  | Speech and Language Updated Plan of Care, Pediatric Speech-Language Services, September 3, 2015 |
| Exhibit P 10 | Clinician Report for ISP Program, August 22, 2016 to October 20, 2016 |
|  | Service Verification Form, August 22, 2016 to October 20, 2016 |
| Exhibit P 11 | Assessment and Current Performance Levels, Rebecca Parenteau, M.S., BCBA, Aurora Behavioral Health Services Inc., October 5, 2016 |
| Exhibit P 12 | Daily Notes, Maureen Johnson, OTR/L, Alaska OT Services, September 26, 2016 to October 26, 2016 |
| Exhibit P 13 | Letter from Cara Leckwold, M.A., CCC-SLP |
| Exhibit P 14 | Community Matrix, Cara Leckwold, M.A., CCC-SLP, October 31, 2016 |
|  | Summary: Speech Therapy, Cara Leckwold, M.A., CCC-SLP, October 27, 2016 |
| Exhibit P 15 | Clinician Report for ISP Program, August 22, 2016 to November 2, 2016 |
| Exhibit P 16 | CBC Closure Report, June 28, 2016 |
| Exhibit P 17 | CBC Functional Assessment Behavioral Support Plan |
| Exhibit P 18 | Intellectual and Development Disabilities Waiver Plan of Care, April 16, 2017 |

### Educational Records

| Exhibit P 19 | Student Health Profile Report |
| Exhibit P 20 | IEP, April 16, 2015 |
| Exhibit P 21 | Quarterly Progress Reports for April 16, 2015 IEP |
| Exhibit P 22 | E-Mail Correspondence, Jose Pabon and Victoria Ackerman, BVI, Anchorage School District, August 20, 2015 to January 27, 2016 |
| Exhibit P 23 | E-Mail Correspondence, Melissa Janigo, M.A., CCC-SLP, Anchorage School District, August 14, 2015 to December 16, 2015 |
| Exhibit P 24 | Service Notes, Victoria Ackerman, BVI, Anchorage School District, August 20, 2015 to January 28, 2016 |

Exhibit P 25    E-Mail Correspondence, Victoria Ackerman, BVI, and Craig Holmes, AT, Anchorage School District, October 7, 2015 to April 29, 2016

Exhibit P 26    Data Sheet, 2015-2016 School Year

Sensory Chart

Exhibit P 27    Request for Educational Records from Anne Applegate, Esq., Disability Law Center of Alaska, to Cindy Anderson, Director of Special Education, Anchorage School District, January 21, 2016

Exhibit P 28    See Joint Exhibit 2

Exhibit P 29    Letter from Cindy Anderson, Director of Special Education, Anchorage School District, to Betsy and Brian G., January 29, 2016

Exhibit P 30    Invitation to Attend a Meeting, April 22, 2016

Invitation to Attend a Meeting, April 28, 2016

Invitation to Attend a Meeting, May 13, 2016

Exhibit P 31    E-Mail Correspondence, Jason Hlasny and Cindy Anderson, Special Education, Anchorage School District, March 29, 2016 to April 21, 2016

Exhibit P 32    See Joint Exhibit 4

Exhibit P 33    IEP, May 18, 2016 (Printout Dated May 24, 2016)

Exhibit P 34    Cover Letter to Perkins School for the Blind Evaluation Report from Justine Rines, Evaluations Coordinator, to Cindy Anderson, Director of Special Education, Anchorage School District, May 18, 2016

Exhibit P 35    Research Regarding Residential Placements Provided by Betsy and Brian G. to District at Placement Meeting on June 8, 2016

Exhibit P 36    Authorization for Release of Information, June 12, 2016

Exhibit P 37    ESER, June 16, 2016

E-Mail Correspondence, Eudora Fraczek, Private Consultant, June 17, 2016 to August 3, 2016

Exhibit P 38    Consent for Release of Information, July 11, 2016

*M.G. v. Anchorage School District*
STUDENT'S EXHIBITS

Due Process Hearing Request 17-09
Page 3 of 7

| Exhibit P 39 | Letter from Christopher Underwood, Director of Admissions and Evaluations, Perkins School for the Blind, to Cindy Anderson, Director Special Education, Anchorage School District, July 29, 2016 |
|---|---|
| | Individualized Treatment Plan for M.G., Perkins School for the Blind, 2016-2017 School Year |
| | Booklet, *Program of Studies*, Perkins School for the Blind |
| Exhibit P 40 | See Joint Exhibit 5 |
| Exhibit P 41 | See Joint Exhibit 6 |
| Exhibit P 42 | See Joint Exhibit 7 |
| Exhibit P 43 | See Joint Exhibit 8 |
| Exhibit P 44 | See Joint Exhibit 9 |
| Exhibit P 45 | Consent for Release of Education Records to Jennifer White, Able Opportunities, August 30, 2016 |
| Exhibit P 46 | See Joint Exhibit 10 |
| Exhibit P 47 | Consent for Release of Education Records to the Maryland School for the Blind, September 21, 2016 |
| Exhibit P 48 | See Joint Exhibit 11 |
| Exhibit P 49 | Information Regarding the Maryland School for the Blind Provided by the Anchorage School District to Betsy and Brian G. October 12, 2016 |
| | Information Regarding the Nebraska Center for the Education of Children Who are Blind or Visually Impaired Provided by the Anchorage School District to Betsy and Brian G. October 12, 2016 |
| | Settlement Proposal Provided by the Anchorage School District to Betsy and Brian G. October 12, 2016 |
| Exhibit P 50 | Unilateral Placement Letter from Betsy and Brian G. to Cindy Anderson, Director of Special Education, Anchorage School District, October 18, 2016 |
| Exhibit P 51 | See Joint Exhibit 12 |
| Exhibit P 52 | See Joint Exhibit 13 |

*M.G. v. Anchorage School District*
STUDENT'S EXHIBITS

Due Process Hearing Request 17-09
Page 4 of 7

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 20 of 53
Exhibit A
Page 18 of 51

Exhibit P 53    Consent for Evaluation (FBA) signed by Betsy G. October 26, 2016

Exhibit P 54    Private Provider Records Obtained and Provided by Betsy and Brian G. to the Anchorage School District, October 24, 2016[1]

Exhibit P 55    See Joint Exhibit 14

Exhibit P 56    See Joint Exhibit 15

Exhibit P 57    E-Mail and Attachments, Susan Sonneborn, Esq., November 15, 2016

Exhibit P 58    E-Mail Correspondence between Cindy Anderson, Special Education Director, Anchorage School District, and Betsy and Brian G., November 18, 2016 to December 1, 2016

Exhibit P 59    E-Mail Correspondence and Attachments, Anne Applegate, Esq., May 2, 2016 to August 8, 2016

Exhibit P 60    E-Mail Correspondence and Attachments, Anne Applegate, Esq., August 24, 2016 to October 6, 2016

Exhibit P 61    E-Mail Correspondence and Attachments, Anne Applegate, Esq., October 25, 2016 to December 6, 2016

### Additional Parent Communications

Exhibit P 62    Travel Expenses, April 28, 2017 to May 8, 2017

                E-Mail Correspondence between Betsy and Brian G. and Perkins School for the Blind, March 24, 2017 to October 18, 2015

Exhibit P 63    E-Mail Correspondence between Betsy and Brian G. and the Anchorage School District, March 3, 2017 to August 25, 2015

Exhibit P 64    E-Mail Correspondence between Betsy and Brian G. and Various Residential Placements

Exhibit P 65    Admission Materials for Perkins School for the Blind

### Additional Educational Records

Exhibit P 66    E-Mail Correspondence, Cindy Anderson, Director of Special Education, Anchorage School District, October 3, 2016 to November 18, 2016

---

[1] Please note that Exhibit P 54 contains documents also found at Exhibits P 10, 12 & 15.

*M.G. v. Anchorage School District*                      Due Process Hearing Request 17-09
STUDENT'S EXHIBITS                                        Page 5 of 7

| Exhibit P 67 | E-Mail Correspondence, Cindy Anderson, Director of Special Education, Anchorage School District, January 28, 2016 to March 29, 2016 |
| Exhibit P 68 | E-Mail Correspondence, Laura Allen, Director of Federal and State Compliance, Special Education, Anchorage School District, October 15, 2016 to December 2, 2016 |
| Exhibit P 69 | E-Mail Correspondence, Victoria Ackerman, BVI, Anchorage School District, April 21, 2016 to May 6, 2016 |
| Exhibit P 70 | E-Mail Correspondence, Victoria Ackerman, BVI, Anchorage School District, August 20, 2015 to January 27, 2016 |
| Exhibit P 71 | E-Mail Correspondence, Chris Sturm, Behavior Analyst, Anchorage School District, December 8, 2016 to October 25, 2016 |
| Exhibit P 72 | See Joint Exhibit 16 |

**Miscellaneous**

| Exhibit P 73 | See Joint Exhibit 17 |
| Exhibit P 74 | Multi-Impaired Special Services Residential Rates, FY17 and FY18 (Estimate), Perkins School for the Blind |
| Exhibit P 75 | Letter from Ruth Ann Hynson, Director of Statewide Outreach Services, Maryland School for the Blind, March 30, 2017 |
| Exhibit P 76 | Prior Written Notices in Chronological Order, April 29, 2016 to November 1, 2016 |
| Exhibit P 77 | Enrollment Agreement, Perkins School for the Blind |
| Exhibit P 78 | Affidavits from the Anchorage School District |

RESPECTFULLY SUBMITTED this 3rd day of April, 2017.

_____
Jacob Kammermeyer (AK Bar No. 0506043)
Disability Law Center of Alaska
230 S. Franklin St., Ste. 206
Juneau, AK 99801
Telephone: (907) 586-4371
Fax: (907) 586-1066
E-Mail: jkammermeyer@dlcak.org

*M.G. v. Anchorage School District*
STUDENT'S EXHIBITS

Due Process Hearing Request 17-09
Page 6 of 7

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 22 of 53
Exhibit A
Page 20 of 51

Attorney for the Family

Certificate of Service

Served via e-mail on Susan Sonneborn and Betsy Bull on April 3, 2017.

_____
Jacob Kammermeyer

BEFORE THE ALASKA DEPARTMENT OF
EDUCATION AND EARLY DEVELOPMENT
SPECIAL EDUCATION DUE PROCESS HEARING OFFICER

| | |
|---|---|
| M.G., a minor and his parents | ) |
| Betsy and Brian Goudreau, | ) |
| | ) |
| Petitioners, | ) |
| vs. | ) |
| | ) |
| ANCHORAGE SCHOOL DISTRICT, | ) |
| | ) |
| Respondent. | ) DEED DPH No. 17-09 |

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

## ANCHORAGE SCHOOL DISTRICT'S EXHIBIT LIST

Anchorage School District, by and through its counsel of record, Susan G. Sonneborn and Jermain Dunnagan & Owens, P.C., hereby submits its list of exhibits that may be called at the Due Process Hearing beginning April 13, 2017:

| EXHIBITS | |
|---|---|
| **A** | **Evaluations** |
| Joint | ESER dated January 21, 2014 |
| DA.2 | Colorado Assessment |
| DA.3 | Perkins IEE |
| DA.4 | Draft ESER |
| DA.5 | Parent Comments to Draft ESER |
| DA.6 | Consent for Evaluation dated October 25, 2016 |
| DA.7 | Assessment of Jennifer White |
| DA.8 | ASD BCBA Report |
| DA.9 | Consent for Evaluation dated November 15, 2016 |
| DA.10 | Invitation to Attend an ESER Meeting on December 14, 2016 |
| | |
| **B** | **Individual Educational Plans** |
| DB.1 | IEP signature pages |
| Joint | Draft IEP dated May 18, 2016 |
| DB.3 | Invitation to Attend an IEP Meeting on December 16, 2016 |
| | |

| C | Prior Written Notices |
|---|---|
| Joint | PWN dated April 29, 2016 |
| DC.2 | PWN dated May 24, 2016 |
| Joint | PWN dated August 11, 2016 |
| Joint | PWN dated August 18, 2016 |
| DC.5 | PWN dated September 2, 2016 |
| DC.6 | PWN dated October 25, 2016 |
| Joint | PWN dated October 26, 2016 |
| Joint | PWN dated November 1, 2016 |

| D | Private Provider Records |
|---|---|
| DD.1 | Home & Community Based Medicaid Waiver Plan of Care |
| DD.2 | Aurora Behavioral Health Assessment |
| DD.3 | UAA/CHD CBC |
| DD.4 | Private Alaska OT Services |
| DD.5 | FOCUS Provider Records |
| DD.6 | The ARC Provider Records |
| DD.7 | Private SLP Report and Color Communication Matrix |
| DD.8 | CBC BIP updated February 19, 2015 |
| DD.9 | CBC Closing Paperwork dated June 28, 2016 |
| DD.10 | District's Demonstrative Exhibit |

| E | Records of Jennifer White |
|---|---|
| DE.1 | CV |
| DE.2 | March 2017 Report |
| DE.3 | Communication and Autism Handout |
| DE.4 | Picture Object Communication Systems |
| DE.5 | Sighted Guide |

| F | Correspondence |
|---|---|
| DF.1 | Summary of Emails Between Counsel |
| DF.2 | January 21, 2016 Email from A. Applegate to S. Sonneborn |
| Joint | January 28, 2016 Letter from A. Applegate |
| Joint | January 29, 2016 Letter from C. Anderson |
| DF.5 | March 29, 2016 Email from A. Applegate to C. Anderson |
| DF.6 | April 8, 2016 Email from J. Hlasny to A. Applegate |
| DF.7 | April 15, 2016 Email from A. Applegate to J. Hlasny |
| DF.8 | May 18, 2016 Email from A. Applegate to J. Hlasny and C. Anderson |
| DF.9 | May 19, 2016 Email from S. Sonneborn to A. Applegate |
| DF.10 | May 20, 2016 Email from A. Applegate to S. Sonneborn |

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

{00703054}ANCHORAGE SCHOOL DISTRICT'S EXHIBIT LIST
M.G. v. Anchorage School District
DEF CASE NO. Exhibit A
Case 3:17-cv-00187-SLG   Document 1-2   Filed 07/12/17   Page 23 of 51
Page 2 of 7   Page 25 of 53

| DF.11 | May 24, 2016 Email from J. Hlasny to S. Sonneborn and A. Applegate |
|---|---|
| DF.12 | June 8, 2016 Email from A. Applegate to S. Sonneborn |
| DF.13 | June 10, 2016 Email from S. Sonneborn to A. Applegate |
| DF.14 | June 14, 2016 Email from A. Applegate to S. Sonneborn |
| DF.15 | June 16, 2016 Email from E. Fraczek to A. Applegate |
| DF.16 | June 20, 2016 Email from A. Applegate to S. Sonneborn |
| DF.17 | June 20, 2016 Email from S. Sonneborn to A. Applegate |
| DF.18 | June 21, 2016 Email from E. Fraczek to A. Applegate |
| DF.19 | June 22, 2016 Email from E. Fraczek to A. Applegate |
| DF.20 | June 30, 2016 Email from A. Applegate to S. Sonneborn |
| DF.21 | July 3, 2016 Email from S. Sonneborn to A. Applegate |
| DF.22 | July 11, 2016 Email from S. Sonneborn to A. Applegate |
| DF.23 | July 14, 2016 Email from S. Sonneborn to Perkins |
| DF.24 | July 18, 2016 Email from A. Applegate to S. Sonneborn |
| DF.25 | July 19, 2016 Email from S. Sonneborn to A. Applegate |
| DF.26 | July 22, 2016 Email from A. Applegate to S. Sonneborn |
| DF.27 | July 22, 2016 Email from S. Sonneborn to A. Applegate |
| DF.28 | July 28, 2016 Email from A. Applegate to E. Fraczek |
| DF.29 | July 28, 2016 Email from J. Sleeper to A. Applegate |
| DF.30 | July 28, 2016 Email from A. Applegate to J. Sleeper |
| DF.31 | July 28, 2016 Email from J. Sleeper to A. Applegate |
| DF.32 | July 28, 2016 Email from A. Applegate to J. Sleeper |
| DF.33 | July 29, 2016 Letter from Perkins to C. Anderson |
| DF.34 | July 31, 2016 Email from E. Fraczek to A. Applegate |
| DF.35 | July 31, 2016 Email from A. Applegate to E. Fraczek |
| Joint | August 3, 2016 Letter from A. Applegate to C. Anderson |
| DF.37 | August 7, 2016 Email from S. Sonneborn to A. Applegate |
| DF.38 | August 8, 2016 Email from A. Applegate to S. Sonneborn |
| Joint | August 11, 2016 Letter from S. Sonneborn to A. Applegate |
| DF.40 | August 16, 2016 Email from S. Sonneborn to A. Applegate |
| DF.41 | August 17, 2016 Email from A. Applegate to S. Sonneborn |
| DF.42 | August 18, 2016 Letter from A. Applegate to S. Sonneborn |
| DF.43 | August 18, 2016 Email from S. Sonneborn to L. Smith |
| Joint | August 23, 2016 Letter from DHHS |
| DF.45 | August 24, 2016 Email from S. Sonneborn to A. Applegate |
| DF.46 | August 26, 2016 Letter from S. Sonneborn to A. Applegate |
| DF.47 | August 26, 2016 Email from A. Applegate to S. Sonneborn |
| DF.48 | August 26, 2016 Email from A. Applegate to L. Smith |
| DF.49 | August 29, 2016 Email from L. Smith to A. Applegate |
| DF.50 | August 30, 2016 Email from S. Sonneborn to A. Applegate |

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

(00703054)ANCHORAGE SCHOOL DISTRICT'S EXHIBIT LIST
M.G. v. Anchorage School District

| DF.51 | August 31, 2016 Email from A. Applegate to S. Sonneborn |
|---|---|
| DF.52 | August 31, 2016 Email from S. Sonneborn to A. Applegate |
| DF.53 | August 31, 2016 Email from A. Applegate to S. Sonneborn |
| Joint | September 2, 2016 Email from S. Sonneborn to A. Applegate |
| DF.55 | September 7, 2016 Email from A. Applegate to S. Sonneborn |
| DF.56 | September 7, 2016 Email from S. Sonneborn to A. Applegate |
| DF.57 | September 7, 2016 Email from A. Applegate to S. Sonneborn |
| DF.58 | September 8, 2016 Email from A. Applegate to S. Sonneborn |
| DF.59 | September 9, 2016 Email from A. Applegate to S. Sonneborn |
| DF.60 | September 12, 2016 Email from A. Applegate to S. Sonneborn |
| DF.61 | September 12, 2016 Email from S. Sonneborn to A. Applegate |
| DF.62 | September 13, 2016 Email from S. Sonneborn to A. Applegate |
| DF.63 | September 14, 2016 Email from A. Applegate to S. Sonneborn |
| DF.64 | September 14, 2016 Email from S. Sonneborn to A. Applegate |
| DF.65 | September 14, 2016 Email from S. Sonneborn to A. Applegate |
| DF.66 | September 14, 2016 Email from S. Sonneborn to K. Creasy |
| DF.67 | September 14, 2016 Email from A. Applegate to S. Sonneborn |
| DF.68 | September 14, 2016 Email from A. Applegate to S. Sonneborn |
| DF.69 | September 14, 2016 Email from S. Sonneborn to A. Applegate |
| DF.70 | September 15, 2016 Email from S. Sonneborn to A. Applegate |
| DF.71 | September 15, 2016 Email from S. Sonneborn to A. Applegate |
| DF.72 | September 15, 2016 Email from A. Applegate to S. Sonneborn |
| DF.73 | September 15, 2016 Email from K. Creasy to S. Sonneborn |
| DF.74 | September 15, 2016 Email from S. Sonneborn to K. Creasy |
| DF.75 | September 15, 2016 Email from A. Applegate |
| DF.76 | September 19, 2016 Email from S. Sonneborn to A. Applegate |
| DF.77 | September 24, 2016 Email from A. Applegate to S. Sonneborn |
| DF.78 | September 25, 2016 Email from S. Sonneborn to A. Applegate |
| DF.79 | September 26, 2016 Email from A. Applegate to S. Sonneborn |
| DF.80 | September 27, 2016 Email from S. Sonneborn to A. Applegate |
| DF.81 | September 27, 2016 Email from S. Sonneborn to K. Creasy |
| DF.82 | September 27, 2016 Email from A. Applegate to S. Sonneborn |
| DF.83 | September 27, 2016 Email from A. Applegate to S. Sonneborn |
| DF.84 | September 28, 2016 Email from A. Applegate to S. Sonneborn |
| DF.85 | September 28, 2016 Email from A. Applegate to S. Sonneborn |
| DF.86 | September 29, 2016 Email from S. Sonneborn to A. Applegate |
| DF.87 | September 30, 2016 Email from S. Sonneborn to A. Applegate |
| DF.88 | October 3, 2016 Email from A. Applegate to S. Sonneborn |
| DF.89 | October 3, 2016 Email from S. Sonneborn to A. Applegate |
| DF.90 | October 6, 2016 Email from S. Sonneborn to A. Applegate |

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

| | |
|---|---|
| DF.91 | October 6, 2016 Email from A. Applegate to S. Sonneborn |
| DF.92 | October 6, 2016 Email from A. Applegate to S. Sonneborn |
| DF.93 | October 10, 2016 Email from A. Applegate to S. Sonneborn |
| DF.94 | October 10, 2016 Email from S. Sonneborn to A. Applegate |
| DF.95 | October 18, 2016 Email from S. Sonneborn to A. Applegate |
| DF.96 | October 18, 2016 Letter from Parents to C. Anderson |
| DF.97 | October 24, 2016 Email from S. Sonneborn to A. Applegate |
| DF.98 | October 24, 2016 Email from A. Applegate to S. Sonneborn |
| DF.99 | October 25, 2016 Email from S. Sonneborn to A. Applegate |
| DF.100 | October 25, 2016 Email from S. Sonneborn to A. Applegate |
| DF.101 | October 25, 2016 Email from A. Applegate to S. Sonneborn |
| DF.102 | October 25, 2016 Email from A. Applegate to S. Sonneborn |
| DF.103 | October 26, 2016 Email from B. Bull to A. Applegate |
| DF.104 | October 26, 2016 Email from B. Bull to A. Applegate |
| DF.105 | October 26, 2016 Email from B. Bull to A. Applegate |
| DF.106 | October 26, 2016 Email from B. Bull to A. Applegate |
| DF.107 | October 27, 2016 Email from A. Applegate to B. Bull |
| DF.108 | October 27, 2016 Email from A. Applegate to B. Bull |
| DF.109 | October 27, 2016 Email from B. Bull to A. Applegate |
| DF.110 | October 27, 2016 Email from A. Applegate to B. Bull |
| DF.111 | October 27, 2016 Email from B. Bull to A. Applegate |
| DF.112 | October 31, 2016 Email from A. Applegate |
| DF.113 | October 31, 2016 Email from A. Applegate |
| DF.114 | October 31, 2016 Email from A. Applegate |
| DF.115 | November 1, 2016 Email from A. Applegate |
| DF.116 | November 1, 2016 Email from S. Sonneborn to A. Applegate |
| DF.117 | November 1, 2016 Email from S. Sonneborn to A. Applegate |
| DF.118 | November 1, 2016 Email from A. Applegate to S. Sonneborn |
| DF.119 | November 1, 2016 Email from S. Sonneborn to A. Applegate |
| DF.120 | November 1, 2016 Email from A. Applegate to S. Sonneborn |
| DF.121 | November 1, 2016 Email from S. Sonneborn to A. Applegate |
| DF.122 | November 2, 2016 Email from A. Applegate to S. Sonneborn |
| DF.123 | November 2, 2016 Email from S. Sonneborn to A. Applegate |
| DF.124 | November 2, 2016 Email from A. Applegate to S. Sonneborn |
| Joint | November 2, 2016 Letter from S. Sonneborn to A. Applegate |
| DF.126 | November 4, 2016 Email from A. Applegate to S. Sonneborn |
| DF.127 | November 6, 2016 Email from S. Sonneborn to A. Applegate |
| DF.128 | November 8, 2016  Email from J. White to L. Allen |
| DF.129 | November 15, 2016 Email from S. Sonneborn to A. Applegate |
| DF.130 | November 17, 2016 Email from S. Sonneborn to A. Applegate |

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

{00703054}ANCHORAGE SCHOOL DISTRICT'S EXHIBIT LIST
M.G. v. Anchorage School District
DEF EXH 3-112                                                    Exhibit A
Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 28 of 53
Page 5 of 7                              Page 26 of 51

| DF.131 | November 18, 2016 Email from S. Sonneborn to A. Applegate |
|--------|-----------------------------------------------------------|
| DF.132 | November 18, 2016 Email from B. Goudreau to C. Anderson |
| DF.133 | November 21, 2016 Email from S. Sonneborn to A. Applegate |
| DF.134 | November 30, 2016 Email from B. Goudreau to C. Anderson |
| DF.135 | November 30, 2016 Email from S. Sonneborn to A. Applegate |
| DF.136 | December 1, 2016 Email from S. Sonneborn to A. Applegate |
| DF.137 | December 1, 2016 Email from C. Anderson to Parents |
| DF.138 | December 2, 2016 Email from A. Applegate to S. Sonneborn |
| DF.139 | December 5, 2016 Email from S. Sonneborn to A. Applegate |
| DF.140 | February 17, 2017 Email from S. Sonneborn to J. Kammermeyer |
| DF.141 | March 2, 2017 Email from S. Sonneborn to J. Kammermeyer |

| **G** | **Perkins** |
|-------|-------------|
| DG.1 | Perkins documents provided by Parents on June 8, 2016 |
| DG.2 | Perkins documents provided by Parents on October 12, 2016 |
| Joint | State of Massachusetts Oversight Document provided on October 12, 2016 |
| DG.4 | Perkins Tuition Information |
| DG.5 | Emails between S. Sonneborn and Perkins regarding tuition |
| DG.6 | Perkins Individualized Treatment Plan provided in July 2016 |

| **H** | **Offers** |
|-------|-----------|
| DH.1 | Residential Placement Settlement Offer |
| DH.2 | Information Provided Regarding Maryland School for the Blind |
| DH.3 | Information Provided Regarding Nebraska School for the Blind |
| DH.4 | ACE/ACT Settlement Offer |
| Joint | Perkins Settlement Offer |
| Joint | Chart of Schools Investigated |

| **I** | **Miscellaneous** |
|-------|-------------------|
| DI.1 | Excerpts of the Alaska Special Education Handbook |
| DI.2 | Parents' June 8, 2016 List of Schools for Consideration |
| DI.3 | ACE/ACT Information and Video |

Anchorage School District reserves the right to supplement these exhibits as additional documents become available and including those produced to counsel by various agencies and/or medical providers, and to introduce documents as appropriate under

{00703054}ANCHORAGE SCHOOL DISTRICT'S EXHIBIT LIST
M.G. v. Anchorage School District

Case 3:17-cv-00157-SLG    Document 1-2    Filed 07/12/17    Page 29 of 53
Page 6 of 7        Page 27 of 51
Exhibit A

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

Alaska Rules of Evidence and/or Alaska Rules of Civil Procedure for purposes of impeachment or rebuttal.

DATED this 4th day of April, 2017, at Anchorage, Alaska.

JERMAIN DUNNAGAN & OWENS, P.C.
Attorneys for Respondent, Anchorage School District

By: _____

Susan G. Sonneborn   for
Alaska Bar Association No.: 1306033   1411085

CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of
April, 2017, a true and correct copy of the
foregoing was served by email and mail,
postage pre-paid on:

Jacob Kammermeyer
Disability Law Center of Alaska, Juneau
230 South Franklin #206
Juneau, AK 99801
jkammermeyer@dlcak.org

LAW OFFICES OF
JERMAIN DUNNAGAN & OWENS
A PROFESSIONAL CORPORATION
3000 A STREET, SUITE 300
ANCHORAGE, ALASKA 99503
(907) 563-8844
FAX (907) 563-7322

[007030541]ANCHORAGE SCHOOL DISTRICT'S EXHIBIT LIST
M.G. v. Anchorage School District

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 30 of 53
Page 7 of 7   Page 28 of 51
Exhibit A

Sheila Gallagher Lawyer LLC
Hearing Officer for HR No. 17-09
200 West 34th Ave., PMB 774
Anchorage, Alaska 99503
Telephone: (907) 276-1641
E-Mail: sheilagallagher1948@yahoo.com

Re: Due Process Hearing Request 17-09

## JOINT EXHIBITS

The Parties have agreed to the following joint exhibits, which may be offered into evidence at the Due Process Hearing in this matter:

| | |
|---|---|
| Exhibit JT1 | Intellectual and Development Disabilities Waiver Plan of Care, April 25, 2016 |
| Fxhibit JT2 | Request for Comprehensive Evaluations from Anne Applegate, Esq., Disability Law Center of Alaska, to Cindy Anderson, Director of Special Education, Anchorage School District, January 28, 2016 |
| Exhibit JT3 | Prior Written Notice, April 29, 2016 |
| Exhibit JT4 | Letter from Anne Applegate, Esq., Disability Law Center of Alaska, to Cindy Anderson, Director of Special Education, Anchorage School District, August 3, 2016 |
| Exhibit JT5 | Letter from Susan Sonneborn, Esq., Jermaine, Dunnagan & Owens, to Anne Applegate, Esq., Disability Law Center of Alaska, August 11, 2016 |
| Exhibit JT6 | Prior Written Notice, August 11, 2016 |
| Exhibit JT7 | Prior Written Notice, August 18, 2016 |
| Exhibit JT8 | Letter from Deb Etheridge, Deputy Director, Senior and Disabilities Services, Alaska Department of Health and Social Services, August 23, 2016 |
| Exhibit JT9 | E-Mail Correspondence, Susan Sonneborn, Esq., September 2, 2016 |
| | Prior Written Notice, September 2, 2016 |
| Exhibit JT10 | List of Residential Placements Provided by the Anchorage School District to Betsy and Brian G. October 12, 2016 |

*M.G. v. Anchorage School District*
JOINT EXHIBITS

Due Process Hearing Request 17-09
Page 1 of 3

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 31 of 53
Exhibit A
Page 29 of 51

| Exhibit JT11 | Proposed Settlement Agreement Provided by the Anchorage School District to Betsy and Brian G. October 24, 2016 |
|---|---|
| Exhibit JT12 | Prior Written Notice, October 26, 2016 |
| Exhibit JT13 | Prior Written Notice, November 1, 2016 |
| Exhibit JT14 | Letter from Susan Sonneborn, Esq., Jermain, Dunnagan & Owens, to Anne Applegate, Esq., Disability Law Center of Alaska, November 2, 2016 |
| Exhibit JT15 | IEP, May 18, 2016 (Printout Dated August 30, 2016) |
| Exhibit JT16 | Massachusetts Department of Elementary and Secondary Education Private Special Education Program Review Report of Findings Perkins School for the Blind, June 2, 2015 |

RESPECTFULLY SUBMITTED this 5th day of April, 2017.

Jacob Kammermeyer (AK Bar No. 0506043)
Disability Law Center of Alaska
230 S. Franklin St., Ste. 206
Juneau, AK 99801
Telephone: (907) 586-4371
Fax: (907) 586-1066
E-Mail: jkammermeyer@dlcak.org

Attorney for the Family

Susan Sonneborn
Bonnie "Betsy" E. Bull
Jermain, Dunnagan & Owens, PC
3000 A Street, Suite 300
Anchorage, AK 99503
(907) 563-8844
(907) 563-7322

Attorneys for ASD

*M.G. v. Anchorage School District*
JOINT EXHIBITS

Due Process Hearing Request 17-09
Page **2** of 3

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 32 of 53
Exhibit A
Page 30 of 51

Certificate of Service

Served via e-mail on Susan Sonneborn and Betsy Bull on April 7, 2017.

Jacob Kammermeyer

*M.G. v. Anchorage School District*
**JOINT EXHIBITS**

Due Process Hearing Request 17-09
Page **3** of **3**

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 33 of 53
Exhibit A
Page 31 of 51

The assessments completed at Perkins and delivered to ASD on May 18, 2016 will be administratively added as a Reevaluation ESER with 60 calendar days of student's admission to Perkins. In addition ASD may add any relevant information from student's current service providers as observational summaries within the ESER. Parent agree to provide to ASD within 15 day of the receipt of this order, either a signed consent for the following service providers or the described documents:

a) therapp notes and progress notes from ARC for the periods of May 20, 2016 through 5/1/2017.
b) any updated vision reports or records from medical providers treating student completed after March 1, 2016 and not yet given to ASD
c) any updated medical evaluations completed regarding student's medical concerns, including but not limited to his allergies and gastroenterological conditions
d) service records of all of student's private related service providers from May 20, 2016 to May 1, 2017
e) any and all additional evalations completed by private OT, SLP and BCBA s completed after March 1, 2016

For the first four weeks of student's attendance at Perkins, Perkins will implement student's May 2016-2017 IEP unless Perkins staff in their discretion determines that substitute or additional measures should be implemented and added to the IEP.

Perkins will then work with ASD representatives to complete a new Administrative ESER and IEP. The new IEP will cover the period from May 1, 2017 through May 31, 2018. Parents will take all reasonable steps to facilitate collaboration with Perkins and provision of needed information from Perkins to ASD to complete the administrative IEP.

## 2017-2018 School Year

Parents agree to an evaluation to be conducted at Perkins beginning October 1, 2017, which shall be considered in the development of an IEP for student for the 2017-2018 school year. The evaluation will primarily utilize data from the IEP implementation by Perkins staff and detailed observations conducted by the ASD evaluation team described below.

The ASD shall select an evaluation team to include a special educator with Blind/visual impairment expertise, a special educator with transition expertise, a BCBA and a school psycologist, unless one team member meets more than one criterion. The ASD will share the credentials of the evaluators with parents however selection is solely within the discretion of the ASD.

The ESER revisions will be accomplished using available information from Perkins, student's related service providers and any private provider with whom the parents have personally contracted. Any additional evaluations required for a reevaluation will be completed by ASD personel unless ASD determines Perkins personal can provide the evaluation within their implementation of student's educational program.

A revised ESER will be completed by the Evaluation Team and parents by December 1, 2017.

ASD's BCBA will collaborate with the Perkins behavioral staff to complete a functional behavior analysis and draft FBP by November 1, 2017.

The 2017-2018 IEP shall be completed by December 1, 2017.

The team to develop the 2017-18 IEP will include parents, the Perkins team implementing student's IEP, the evaluation team and District representatives and consultants. A District administrator will serve as District representative for the team. The IEP team described in this paragraph will determine placement for student for the 2018-2019 school year and the balance of the 2017-18 school year.

ASD will provide and parents agree to sign a Release of Information no later than 15 days from the receipt of this order. Parents will agree in the ROI to release all new data, infomal and formal standardized assessments, copies of instruction plans and progress reports regarding student from Perkins to ASD and allow the verbal exchange of intormation with Perkins educational staff to plan and complete the administrative ESER and IEP.

## TUITION PAYMENTS

The District will pay for implementation of student's IEP at Perkins with the following conditions:

a)  tuition payments will be made to Perkins upon receipt of an invoice for the period outlined in paragraph one of this order. Parents will be reimbursed for the deposit of $5,000.00 on or before July 15, 2017.
b)  parents agree to deliver the Perkins invoices to ASD and ASD agrees to make its payment within thirty calendar days of receipt of the invoice from the parents. Invoices are to be in care of Cindy Anderson, ASD Special Education Executive Director, 5530 E. Northern Lights Blvd, Anchorage, Alaska 99504 via regular mail or e mail.
c) Invoices are due to the District monthly begining July 1, 2017.
d) ASD requests that copies of student's monthly progress reports from the prior month with copies of all daily data provided in electronic format be submitted with every tuition invoice. Word or pdf format is preferable.
e) Delay in the submission of monthly progress reports with supporting data to ASD will result in a delay in payment of the tuition. ASD will have one month from receipt of the late progress reports to make the next tuition payment. Penalties, financial or otherwise, that my be imposed by Perkins as a result of this delay in payment will be the sole and complete responsibility of parents.
f) If ASD provides to parents written notification of missing monthly reports or supporting data, parents agree to provide the requested information within ten calendar days of the written notice.
g) Student, while at Perkins will remain an enrolled student of ASD for purposes of State of Alaska funding for students with intensive needs.
h) ASD payment of student's tuition at Perkins after May 1, 2017 is not dependent upon student's eligibility for intensive funding reimbursement pursuant to Alaska statutes and regulation. The district will continue its best effort to maintain student's eligibility for

intensive funding.

ASD agrees to pay up to $1388.77 per school day, as stated in the Perkins Tuition Rate Schedule for FY 2017 for the costs associated with student's attendance at Perkins from May 1, 2017 to February 18, 2018. This order does not require ASD to make any payment to Perkins for costs associated with student's attendance at Perkins after February 18, 2018 unless ASD specifically agrees to pay such additional costs. If Perkins tuition costs and services exceed the rate of $1388.77 per school day from May 1, 2017 to February 18, 2018, parents will pay the difference. ASD's payment to Perkins is not "compensatory education." If parents are notified by Medicaid that Perkins becomes a Medicaid eligible facility or that Medicaid funds are available or may be available for contribution toward the cost of Perkins, parents agree to notify the District so that the District may seek contribrution from Medicaid.

In the event that parents unilaterally withdraw student from Perkins prior to the end of the term of this order, the following terms will apply.

a)  Parent will provide notice to the District before a scheduled tuition payment is made to Perkins.
b) Parents are solely responsible to reimburse the District any advance tuition funds, if any,  that may have been paid for day or months in which student will not be in attendance. Reimbursement to the District will be calculated at the rate of $1,388.77 for each school day student was and or will be absent from the program.
c) Reimbursement is due to the ASD within sixty calendar days of the date of student's withdrawal. Withdrawal will be determined by either formal withdrawal being completed by parents or effective withdrawal due to student's failure to attend the program for a period of 10 consecutive school days, except in cases of authorized absence.
d) Parents are solely responsible for any and all efforts to collect from Perkins any prepaid tuition for services that are not rendered because of student's withdrawal. In the event parents are successful in collecting a refund from Perkins and parents have already provided reimbursement to ASD as provided here, the refund collected from Perkins shall remain the property of parents up to the level or reimbursement. Refund collected in excess of reimbursement, if any, shall be forwarded by parents to ASD within 30 calendar days if the refund results from ASD payments.

In the event that student discontinues attending Perkins at Perkins' recommendation or requirement of if Perkins is no longer a viable place as described below, student may be placed in an educational placement within the District with educational services comparable to those provided at Perkins. if no educational program exists within the District with services comparable to those student received at Perkins, the parties may agreee upon another residential placement and execute an agreement identify and defining that placement.

In the event that no educational placement with services comparable to Perkins is identified and no other private placement can be agreed upon, the parties shall participate in mediation to determine student's placement. If mediation is not successful, parents shall have rights to a due process hearing.

Parents agree to notify the District if they become aware of any circumstances indicating Perkins is not viable. Parents agree to notify the District of these circumstances. Student's placement at Perkins shall be deemed not viable if:

a) Perkins no longer operates a private school, files for bankruptcy or other protection under state or federal bankruptcy laws, becomes insolvent or makes an assignment for the benefit of its creditors or

b) for a period of twenty (20) consecutive school days, Perkins does not provde the services of a teacher holding a Massachusetts certification to teach special education to students with disabilities or a board certified behavior analyst (BCBA).

### DISTRICT OBSERVATION OF STUDENT AT PERKINS

The ASD, at its sole discetion, may send a District employee or consultant for up to five observations of student in his Perkins program beginning October 1, 2017. Two weeks before any such observaton, the District will provide written notice to the Parent. In the event that the District elects to conduct an observation (s) , the parents agree to collaborate with Perkins and the District to agree upon a time, date and duration of the observation that is amenable to all parties. Such observation will require access to student in the residential and school portions of his day. Should the Dist be prohibited from completing a requested observation, tuition payment swill cease until observations are initiated or resumed. The District retains sole discretion to determine whether it has completed the necessary amount of observations. No prejudice or conclusion will be construed against the ASD in the event it elects not to conduct observations.

CMS Technical Guidance 1915(c) Page 122-123 (https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/Downloads/Technical-Guidance.pdf)

### J. Provision of Waiver Services Out-of-State

Waiver services may be furnished in another state to a waiver participant. For example, it may be more convenient for waiver participants to obtain services in a bordering state. In addition, services such as personal assistance may be furnished to waiver participants who travel to another state to visit family members or for other purposes.

Applicable policies and considerations regarding the provision of waiver services out-of-state are delineated in Olmstead Letter #3 (included in Attachment D to the instructions). In brief, waiver services that are furnished out-of-state must meet the state of residence waiver standards and requirements in all respects. That is, the out-of-state provider that furnishes the services must meet the same qualifications as in-state providers and there must be a provider agreement in effect. In addition, when services are furnished out-of-state, they are subject to the same monitoring requirements as if they were furnished in-state. As discussed in Olmstead Letter #3, a state may enter into agreements with other states to facilitate the provision of services out-of-state.

### Provider Requirements

The waiver assurances at 42 CFR §441.302(a) require that: (a) there are adequate standards for all types of providers that provide services under the waiver and (b) that the standards must be met when services are furnished. In other words, waiver services may only be furnished by providers who have been found to meet all applicable qualifications. In Appendix C-3, the standards that apply to each waiver service are specified along with the qualifications that providers must meet. Considerations that apply to the specification of provider qualifications are discussed below. In addition, the waiver's Quality Improvement Strategy related to providers in Appendix C and in the systems improvement strategies described in Appendix H must address how the state will verify that providers meet applicable standards during the period that the waiver is in effect.

In addition, it is important to keep in mind that §1902(a)(27) of the Act (as further specified in 42 CFR §431.107(b)) requires that each provider of a Medicaid service have a provider agreement in effect with the Medicaid agency. This requirement applies to the provision of waiver services and assures accountability in the provision of Medicaid services. The Medicaid agency may authorize in writing that another entity (e.g., the operating agency) may perform the administrative task of executing and holding the provider agreement on its behalf. In the case of participant direction, a financial management services entity may be authorized to execute the provider agreement on behalf of the Medicaid agency. There are two exceptions to this requirement. When waiver services are delivered through managed care entities under a §1915(b)/§1915(c) concurrent waiver, only the managed care entity has an agreement with the Medicaid agency; network providers contract with the managed care entity rather than the Medicaid agency. The other exception is when waiver services are delivered through an Organized Health Care Delivery System (OHCDS) arrangement. Such arrangements are discussed in more detail in the instructions for Appendix I.

EXHIBIT..... D I 4 PAGE. l .. OF. l

CMS Technical Guidance 1915(c) Page 114-115 (https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/Downloads/Technical-Guidance.pdf)

Quality Improvement: Qualified Providers

Qualified Providers

The State demonstrates that it has designed and implemented an adequate system for assuring that all waiver services are provided by qualified providers.

The state verifies that providers initially and continually meet required licensure and/or certification standards and adhere to other standards prior to their furnishing waiver services.

The state monitors non-licensed/non-certified providers to assure adherence to waiver requirements.

The state implements its policies and procedures for verifying that provider training is conducted in accordance with state requirements and the approved waiver.

Instructions

The QIS must describe how the state Medicaid Agency will determine that each waiver assurance (and its associated component elements) is met. The waiver assurance and component elements are listed above. For each component element, this description must include:

• Activities or processes that are related to discovery and remediation, i.e., review, assessment or monitoring processes; who conducts the discovery or remediation activities and with what frequency. These monitoring activities provide the foundation for quality improvement by generating information regarding compliance, potential problems and individual corrective actions. The information can be aggregated and analyzed to measure the overall system performance in meeting the waiver assurances. The types of information used to measure performance, should include relevant quality measures/indicators.

• The entity or entities responsible for reviewing the results (data and information) of discovery and remediation activities to determine whether the performance of the system reflects compliance with the assurances; and,

• The frequency at which system performance is measured.

Technical Guidance

This QIS element focuses on discovery and remediation activities, that is, processes to assess, review, evaluate or otherwise analyze a program, process, operation, or outcome. Specifically, the evidence produced as a result of discovery and remediation activities should provide a clear picture of the state's compliance in meeting an assurance.

EXHIBIT....... PAGE. 2 . OF 3.

CMS Technical Guidance 1915(c) Page 138-139 (https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/Downloads/Technical-Guidance.pdf)

Appendix C-5: Home and Community-Based Settings Requirements

In final rules published on January 16, 2014, CMS moved away from defining home and community-based settings by "what they are not," and toward defining them by the nature and quality of individuals' experiences.

Settings that Isolate

Some settings have the effect of isolating individuals receiving HCBS from the broader community. Settings that have the following two characteristics alone might, but will not necessarily, meet the criteria for having the effect of isolating individuals:

• The setting is designed specifically for people with disabilities, and often even for people with a certain type of disability.

• The individuals in the setting are primarily or exclusively people with disabilities and on-site staff provides many services to them.

Settings that isolate people receiving HCBS from the broader community may have any of the following characteristics:

• The setting is designed to provide people with disabilities multiple types of services and activities on-site, including housing, day services, medical, behavioral and therapeutic services, and/or social and recreational activities.

• People in the setting have limited, if any, interaction with the broader community.

• Settings that use/authorize interventions/restrictions that are used in institutional settings or are deemed unacceptable in Medicaid institutional settings (e.g. seclusion).

The following is a non-exhaustive list of examples of residential settings that typically have the effect of isolating people receiving HCBS from the broader community:

• Farmstead or disability-specific farm community: These settings are often in rural areas on large parcels of land, with little ability to access the broader community outside the farm. Individuals who live at the farm typically interact primarily with people with disabilities and staff who work with those individuals. Individuals typically live in homes only with other people with disabilities and/or staff. Their neighbors are other individuals with disabilities or staff who work with those individuals. Daily activities are typically designed to take place on-site so that an individual generally does not leave the farm to access HCB services or participate in community activities. For example, these settings will often provide on-site a place to receive clinical (medical and/or behavioral health) services, day services, places to shop and attend church services, as well as social activities where individuals on the farm engage with others on the farm, all of whom are receiving Medicaid HCBS. While sometimes people from the broader community may come on-site, people from the farm do not go out into the broader community as part of their daily life. Thus, the setting does not facilitate individuals integrating into the greater

Case 3:17-cv-00157-SLG   Document 1-2   Filed 07/12/17   Page 40 of 53
Exhibit A
Page 38 of 51

community and has characteristics that isolate individuals receiving Medicaid HCBS from individuals not receiving Medicaid HCBS.

• Gated/secured "community" for people with disabilities: Gated communities typically consist primarily of people with disabilities and the staff that work with them. Often, these locations will provide residential, behavioral health, day services, social and recreational activities, and long term services and supports all within the gated community. Individuals receiving HCBS in this type of setting often do not leave the grounds of the gated community in order to access activities or services in the broader community. Thus, the setting typically does not afford individuals the opportunity to fully engage in community life and choose activities, services and providers that will optimize integration into the broader community.

• Residential schools: These settings incorporate both the educational program and the residential program in the same building or in buildings in close proximity to each other (e.g. two buildings side by side). Individuals do not travel into the broader community to live or to attend school. Individuals served in these settings typically interact only with other residents of the home and the residential and educational staff. Additional individuals with disabilities from the community at large may attend the educational program. Activities such as religious services may be held on-site as opposed to facilitating individuals attending places of worship in the community. These settings may be in urban areas as well as suburban and rural areas. Individuals experience in the broader community may be limited to large group activities on "bus field trips." The setting therefore compromises the individual's access to experience in the greater community at a level that isolates individuals receiving Medicaid HCBS from individuals not receiving Medicaid HCBS.

Multiple settings co-located and operationally related (i.e., operated and controlled by the same provider) that congregate a large number of people with disabilities together and provide for significant shared programming and staff, such that people's ability to interact with the broader community is limited. Depending on the program design, this could include, for example, group homes on the grounds of a private ICF or numerous group homes co-located on a single site or close proximity (multiple units on the same street or a court, for example). In CMS' experience, most Continuing Care Retirement Communities (CCRCs), which are designed to allow aging couples with different levels of need to remain together or close by, do not raise the same concerns around isolation as the examples above, particularly since CCRCs typically include residents who live independently in addition to those who receive HCBS.

EXHIBIT ....... PAGE ... 4 ... OF ... 13          2

Attachment 3-e

Subject: Out-of State Services -- Clarification

Date: July 25, 2000

Out-of-State services have been provided by several States for many years, with excellent results in quality of service and quality of life for the waiver participants. Regulations at 42 CFR 431.52 prescribe the conditions under which a State is required to provide out-of-State services. Section

1902(a)(23) of the Social Security Act (the Act) provides that an individual may receive Medicaid services (including home and community-based services (HCBS) waiver services) from any qualified provider willing to furnish the services.

Historically, out-of-State services have been used to support some individuals attending college, and enabled others to visit family members. In addition, there are some areas near State borders where the closest (or most convenient) provider is located in an adjacent State. When convenience or necessity make it advisable for services to be provided outside the State, there is no restriction to in-State services.

When residential out-of-State services are recommended by a State because services within the State are unavailable or insufficient to meet the person's needs, careful consideration must be given to the reason for providing the services, as well as alternatives which may contribute more to an individual's ability to receive quality supports in a community based setting. Services provided in a location remote from the individual's family and friends may not provide appropriate support for the person to live in the most integrated setting appropriate to his or her needs.

When services are provided out-of-State, the standard waiver requirements must continue to be met. Examples include the following:

Written plan of care: The services must be in the person's written plan of care (section 1915(c)(1) of the Act). The plan of care must identify the services to be provided, the amount and type of each service, and the type of provider. The requirement that the type of provider be included in the care plan does not mean that the name of the actual provider must be listed in the plan of care. The plan of care is subject to the approval of the Medicaid agency. The actual provider is subject to the approval of the individual receiving services.

Waiver-Qualified Provider: Services must be furnished by a qualified provider (section

1902(a)(23) of the Act). The provider must meet the standards for service provision that are set forth by the State in the waiver and approved by HCFA. Any standards of licensure or certification which are applicable to the provision of the service must also be met (42 CFR

441.302(a)(2)). This means that any standards applicable to the provision of the service in the State in which the service is furnished must be met, as well as those standards set forth in the approved waiver. If one State were to pay for a service furnished in another, the provider must be qualified under the standards in the waiver, and the service must also meet any applicable requirements in the State in which it is provided.

Olmstead Letter #3

EXHIBIT ....... PAGE ... 5 . OF . 13

Quality Assurance: The State operating the waiver remains responsible for the assurance of the health and welfare of the beneficiary (section 1915(c)(2)(A) of the Act). Oversight may be performed directly by the home State or by the host State in which services are actually received. If it is done by the host State, there must be an interstate compact or agreement setting forth the responsibilities of each party. Under an interstate compact, the State in which services are provided can agree to take over monitoring responsibilities. Some States have compacts which recognize each other's provider agreements. Others recognize each other's provider standards. States have the opportunity to be quite creative in their utilization of these compacts to foster efficient and responsive HCBS programs. We recognize this as an opportunity to expand Medicaid services to meet the needs of individuals in the most integrated settings appropriate.

Choice of Provider: The provider must be chosen by the individual (section 1902(a)(23) of the Act). The provider of out-of-State services must be chosen just as freely as the provider of In-State services. We realize that in some cases, out-of-State services are much closer and more easily obtained than In-State services. This is particularly true when a neighboring State has a large city on or near a State border.

Provider Agreements: The provider must have a provider agreement with the Medicaid agency (section 1902(a)(27) of the Act); and Medicaid payment must be made directly to the provider (section 1902(a)(32) of the Act).

Any or all of the above requirements may be met directly by the State which operates the waiver, or indirectly through an interstate compact in which the second State attends to provider agreement and payment activities.

Any questions concerning this attachment may be referred to Mary Jean Duckett at (410) 786-3294 or Mary Clarkson at (410) 786-5918.

EXHIBIT . . . . . . . PAGE. 6 . OF 13

State of Alaska • Department of Health and Social Services • Senior and Disabilities Services

## Provider Conditions of Participation

*Providers of home and community-based services must be certified under 7 AAC 130.220, and operate in compliance with the Provider Conditions of Participation and with the Conditions of Participation for each service offered to recipients.*

### I. Program operations

### A. Certification requirements.

1. The provider must demonstrate readiness to provide services and comprehension of Medicaid regulations, home and community-based waiver services regulations, and pertinent service Conditions of Participations through documents describing provider operations.
2. The provider must submit, depending on the services the provider elects to offer and as directed by SDS:
   a. policies and procedures addressing the following:
      i. financial accountability;
      ii. confidentiality of protected health information, including a Notice of Privacy Practices;
      iii. conflicts of interest;
      iv. complaint management;
      v. emergency response planning;
      vi. admissions to provider services;
      vii. termination of provider services;
      viii. training;
      ix. evaluation of employees;
      x. background checks;
      xi. quality improvement;
      xii. critical incident reporting;
      xiii. medication management; and
      xiv. restrictive interventions;
   b. documentation showing compliance with state or local regulations, including
      i. State of Alaska business license;
      ii. Certificate of Insurance or similar documentation of insurance coverage;
      iii. licenses for assisted living homes and foster homes;
      iv. building or use permits for site-based services;
      v. vehicle permit for hire;
      vi. vehicle registration; and
      v. food service permit;
   c. personnel information, including
      i. organization chart;
      ii. personnel lists; and
      iii. names of professional and paraprofessional service providers;
   d. other information regarding requirements specified in the service *Conditions of Participation*; and
   e. a quality improvement report for renewal of certification.
3. The provider must implement and abide by all policies and procedures that were submitted for the purposes of gaining certification.
4. The provider must grant to Senior and Disabilities Services, for certification and oversight purposes, access to all service locations or to locations where the provider proposes to render services.

### B. Operations requirements.

1. The provider must
   a. utilize the Senior and Disabilities Services secure electronic interface for submission of confidential and protected health information;

EXHIBIT ....... PAGE ... OF 13

COP-06 (Rev 3-21-14)

  b. maintain all records, required under 7 AAC 105.320, in English;

  c. comply with all regulatory training requirements; and

  d. practice open communications and cooperate with other providers of services.

2. No owner, executive director, board member, authorized agent, employee, or contractor of a provider agency may provide services to recipients if that individual

  a. has been convicted of Medicaid fraud;

  b. has been sanctioned under Medicaid regulations, or has been suspended or terminated from the Medicaid program, because of program abuse or abuse of a recipient; or

  c. has had a valid criminal history check or variance revoked under 7 AAC 10.9453. The provider must comply with the criminal history checks requirements of 7 AAC 10.910 – 7 AAC 10.10.950.

3. The provider may not allow an employee, volunteer, or contractor to provide any services to recipients or to have access to protected health information until the provider has

  a. notification of an individual's valid criminal history check, or of a variance or reconsideration, in accordance with 7 AAC 10.910 – 7 AAC 10.10.950; and

  b. confirmation that the individual's name does not appear on either of the following lists:

   i *Alaska Medical Assistance Excluded Provider List*, and

   ii. *List of Excluded Individuals and Entities* (LEIE) maintained by the U.S. Department of Health and Human Services, Office of Inspector General.

**C. Financial accountability.**

1. The provider must carry insurance that

  a. includes coverage for comprehensive general liability, vehicle automotive liability and workers' compensation, as is appropriate to the services the provider seeks to offer recipients; and

  b. names Senior and Disabilities Services, Provider Certification Section, 550 W. 8th Ave., Anchorage, AK 99501, as a certificate holder for that insurance; a copy of the Certificate of Insurance or similar document showing insurance coverage must be submitted with its application for certification or recertification.

2. The provider may not charge fees for recipient services at a rate higher than those charged to private pay clients for comparable services.

3. The provider must

  a. implement a financial system, based on generally accepted accounting principles, that ensures claims for payment are accurate;

  b. maintain records that support claims for services;

  c. cooperate with all required audits;

  d. report to the Medicaid fiscal agent, and voiding or adjusting, amounts identified as overpayments; and

  e. cooperate with investigation and remediation activities.

4. The provider must report suspected Medicaid fraud, abuse, or waste to the Medicaid Fraud Control Unit by calling 1-907-269-6279 or sending a message to FAX number 1-907-279-6202.

**D. Quality management.**

1. Grievance process.

  a. The provider must develop and implement a protocol for handling and resolving written and oral complaints about services or personnel.

  b. The provider must analyze the complaints each calendar quarter to determine whether issues raised represent single incidents or a pattern, and take appropriate action to resolve issues brought to light by the quarterly analysis.

2. Quality improvement process.

  a. The provider must engage in monitoring and data collection activities related to the delivery of services and recipient satisfaction with the services, analyze findings, and identify problems and opportunities for improvement.

  b. The provider must develop and implement a process for taking action to remedy problems whether the issues relate to a single individual or to systemic program operations.

EXHIBIT ....... PAGE . 8 . OF . 13

COP-06 (Rev 3-21-14)

    c. The provider must utilize its findings from data collection and analysis activities to engage in actions, e.g., policy development, management changes, staff training, or other system level interventions that lead to continuous improvements in its delivery of services.

3. Self-assessment.
   a. The provider must conduct a self-assessment of its quality improvement process annually, at a minimum, for each year of its certification period.
   b. The process must include evaluation of the findings from, and corrective actions taken in regard to,
      i. the grievance process;
      ii. critical incident reports, including reports of harm;
      iii. analyses of medication errors;
      iv. analyses of the use of restrictive interventions;
      v. consumer satisfaction surveys; and
      vi. internal reviews of the provision of services to determine they are provided in accordance with recipient plan of care and meet recipient needs.

4. Quality improvement report.
   a. The provider must summarize data collection activities, findings, and resulting corrective actions and program improvements in a quality improvement report for submission with its application for recertification.
   b. The provider must be able to support the report submitted with data that must be made available to Senior and Disabilities Services upon request.

E. **Reporting changes in provider status.**
   The provider must report the following changes in provider status in writing to the department within the timeframe specified:

1. one business day of
   a. an unforeseen termination of association with a care coordinator;
   b. an unplanned change of program administrator; and
   c. learning that an agency owner or administrator has been charged with or convicted of a criminal offense;
2. ten days prior to
   a. a change in mailing address, email address, or telephone or fax number;
   b. termination of an association with a care coordinator; and
   c. any change related to a family home habilitation site or group-home habilitation site, including the addition or removal of a site as a location where residential habilitation services are provided, and any primary contact changes.
3. thirty days prior to a planned change of program administrator; and
4. sixty days prior to
   a. a change of agency name,
   b. a change in physical location,
   c. a change in the form of organization of its business,
   d. a change of ownership, and
   e. an agency sale or closure.

## II. Program administration

A. Personnel.
1. Program administrator.
   a. The provider must verify that any individual hired for a program administrator position meets the qualifications specified in the service Conditions of Participation.
   b. The provider may accept an applicant whose education was completed in a country other than the United States if the applicant can show that his/her foreign education is comparable to that received in an accredited educational institution in the United States.
      i. The provider may accept a copy of a State of Alaska license issued under AS 08 as showing an applicant's foreign education is comparable to education in the United States.

COP-06 (Rev 3-21-14)

EXHIBIT........ PAGE... 9 .OF. 13

    ii.  For applicants not licensed under AS 08, the provider must inform the applicant that the applicant is responsible for providing
        A)  a foreign educational credentials evaluation report, from an evaluation service approved by the National Association of Credential Evaluation Services, that includes, at a minimum, a description of each course and semester or quarter hour credits earned for that course, and a statement of degree equivalency to education in the United States; and
        B)  certified English translations of any document submitted as part of the application, if the original documents are not in English.
    iii.  The provider must keep documents showing a program administrator's foreign education comparability to that of the United States on file, and make them available to Senior and Disabilities Services upon request.
  c.  The provider may employ an individual to serve as program administrator for more than one service
    i.  if necessitated by the location of an agency office; and
    ii.  if, given the size of the recipient population served and the number of direct care workers employed by the provider, that administrator is capable of being actively engaged in the day-to-day management of each service.
  d.  The provider may use a term other than program administrator for this position (e.g., program director, program manager or program supervisor), but the individual filling the position must meet the requirements for program administrator that are specified in the Conditions of Participation for the services the provider offers.

2.  <u>Direct care workers.</u>
    The provider must identify the skill set needed by direct care workers to render the services the provider offers; the provider may use as a resource the *Alaska Core Competencies for Direct Care Workers in Health and Human Services*.
  b.  The provider must develop and implement a performance evaluation based on the skill set determined to be needed by its direct care workers.
  c.  The provider must assess the performance of direct care workers to ensure they have the ability to work effectively and to identify skills that need further development.

B.  **Training.**
1.  <u>CPR and first aid training.</u>
  a.  The provider must have on file, for each direct care worker, and for each individual providing chore services or agency-based congregate meals or transportation services,  documentation showing successful completion of
    i.  cardiopulmonary resuscitation (CPR) training, within the previous two years, that was taught by an individual who holds a valid CPR instructor credential in accordance with 7 AAC 26.985; and
    ii.  first aid training, within the previous two years, that was taught by an individual certified by the American Red Cross, the American Heart Association, or an equivalent organization approved by Senior and Disabilities Services.
  b.  The provider must ensure that its direct care workers attend CPR and first aid training every two years; however, if that training is not periodically available within 100 miles of the workplace, the training requirement may be met by attendance and completion of the required course every three years.

2.  <u>Orientation and training.</u>
    The provider must provide, for all direct care workers and volunteers,
  a.  orientation to the agency and its relationship to the department;
  b.  training necessary to render services to recipients;
  c.  coaching and feedback regarding performance of services, as needed; and
  d.  all information necessary to perform the services for which the individual is responsible, including pertinent health information, and contact information for assistance and emergencies.

3.  <u>Critical incident reporting training.</u>
  a.  The provider must ensure that all staff are trained in regard to reporting critical incidents to SDS.
  b.  The provider may

COP-06 (Rev 3-21-14)

EXHIBIT ....... PAGE .12. OF .13.

      i.   arrange for staff to attend SDS training, or

      ii.  appoint staff who have attended SDS training to train additional staff.

4. <u>Assistance with self-administration of medication training.</u>

   a. The provider must train all staff responsible for assisting recipients to self-administer medications, except for the staff of providers subject to the requirements of 7AAC 75.240.

   b. The provider must develop and submit to SDS a training policy that includes

      i.   coverage of the topics in 7 AAC 130.227 (j)(2);

      ii.  training goals;

      iii. plans and activities to enable trainees to achieve those goals;

      iv. methods of assessing trainee achievement of the training goals; and

      v.  processes for evaluating the effectiveness of the training methods.

## C. Supervision.

1. The provider must monitor direct care workers and volunteers

   a. to ensure the health, safety, and welfare of recipients;

   b. to identify and report fraud, abuse or waste; and

   c. to provide training to upgrade the skills needed to work with recipients.

2. The provider must ensure that any employee or volunteer who transports a recipient in an employee- or volunteer-owned vehicle

   a. has personal vehicle automotive liability insurance that includes coverage for a recipient in the event of an accident; or

   b. is insured under provisions of the provider agency insurance policy.

3. When a Report of Harm is made to Adult Protective Services (APS) or the Office of Children's Services (OCS) alleging abuse, neglect, or exploitation against a direct care worker or a volunteer, the provider must bar that individual from contact with recipients until the investigation is complete or the allegation is found to be unsubstantiated.

## III. Recipient relationships

### A. Conflicts of interest.

No owner, executive director, board member, authorized agent, employee, or contractor of a provider agency may

1. exploit a relationship with any recipient for personal or business benefit;

2. engage in or allow any financial transaction with, or on the behalf of, any recipient if that transaction could result in personal or financial benefit to anyone other than the recipient;

3. solicit as clients any recipients known to be receiving services from another provider;

4. seek to influence the eligibility determination process by providing false or misleading information about an applicant or recipient; or

5. represent a recipient during any hearing or appeal process.

### B. Recipient health, safety, and welfare.

1. The provider must report any material changes or concerns regarding a recipient's emotional, physical, or psychological condition to the recipient's care coordinator and recipient representative, and, as appropriate, to other providers of services.

2. In the event a recipient experiences a medical emergency or an accident, incident, or injury that requires evaluation by or consultation with a medical professional, or the provider believes emergency assistance is needed because of circumstances that create a risk to the health, safety, and welfare of a recipient or to others, the provider must

   a. contact the appropriate emergency responder, and provide emergency care and support, appropriate to the provider's skill and experience, until the responder arrives; and

   b. cooperate with the responder as requested, including providing current health, diagnostic, and medication information as needed and as available on-site or accessible through a data base or contact known to the provider.

EXHIBIT . . . . . . . PAGE . 11 . OF . 13

3. The provider must communicate and cooperate with other providers to prevent placing recipients at risk; if disagreements or disputes regarding a recipient arise, the recipient's health, safety, and welfare must be the primary factor in reaching a resolution.

C. **Recipient rights.**
   The provider must

1. treat all recipients respectfully;
2. encourage recipient involvement in planning care;
3. cooperate with recipients who elect to change service providers;
4. collaborate with other providers to deliver an integrated program of services;
5. provide information regarding fees for services to recipients;
6. address recipient complaints about services;
7. evaluate whether services are effective for achieving recipient goals; and
8. render quality care by employing competent, trained staff.

D. **Recipient services termination.**
   The provider must implement a termination or discharge procedure for ending involvement with a recipient that

1. factors in the health, safety, and welfare of the recipient;
2. requires documentation that shows failure to cooperate with the delivery of services or risks of physical injury to the provider's employees or to other recipients;
3. includes supervisory review to determine whether
   a. reasonable accommodation measures have been considered and tried, and
   b. termination is appropriate;
4. provides written notice of the reasons for termination to the recipient;
5. informs the recipient regarding the provider's process for appealing a decision to terminate services, and other possible sources for the services being terminated.

EXHIBIT......... PAGE 12 OF 13

COP-06 (Rev 3-21-14)

State of Alaska People with Intellectual and Developmental Disabilities 1915 (c) approved waiver application (http://dhss.alaska.gov/dsds/Documents/pdfs/IDD-Waivers.pdf)

Appendix C: Participant Services

Provider Specifications for Service

Service Name: Intensive Active Treatment

Provider Category:

Agency

Provider Type:

Certified home and community-based service agency

Provider Qualifications

License (specify):

Professional license or paraprofessional under AS.08.

Certificate (specify):

If not licensed (above), AS 14.20.010 with a special education endorsement under 4 AAC 12.330.

For all, SDS Certified IAT provider under 7AAC 130.214, Provider certification and enrollment.

Verification of Provider Qualifications

Entity Responsible for Verification:

License: AK Department of Commerce, Community and Economic Development, Division of Corporations, Business and Professional Licensing.

Certificate: If not license (above), Department of Education and Early Development teaching certificate; for all, SDS Provider Quality Assurance Unit, Provider Certification Section

Frequency of Verification:

Every 2 years

EXHIBIT....... PAGE.13 OF.13

1



| IN STATE FY 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Special Education Programs** | | | | | | | |
| The Governor's budget contains Price Freeze for FY 18. As Such, OSD will not post FY 18 prices until the budget process is complete | | | | | | | |
| | Program Type | Program Name | UFR Program # | DESE Program Code | Days of Operation | Fiscal Year 2017 | | Notes |
| | | | | | | Annual Price | Daily Price | |
| Amego | Day | Amego School Day | 05 | 5017B | 245 | $ 101,708.36 | $ 415.14 | |
| Amego | Res Ed | Autistic | 03 | 5017A | 365 | $ 227,144.10 | $ 622.31 | |
| Archway, Inc. | Res Ed | Archway | 01 | 5034A | 365 | $ 165,813.79 | $ 454.28 | |
| Bay Cove Schools | Day | Bay Cove | B671a | 5112B | 220 | $ 73,128.62 | $ 332.40 | |
| | Day | | | | | | | |
| | Day | | | | | | | |
| Boston College Campus School | Day | Campus School | 1 | 5157A | 198 | $ 87,561.22 | $ 442.23 | 10/1/06 |
| Boston Higashi School | Day | Day Education | 1 | 5154A | 217 | $ 73,856.32 | $ 340.35 | |
| Boston Higashi School | Res Ed | Residential Ed. | 2 | 5154B | 304 | $ 180,839.25 | $ 594.87 | |
| Boston Higashi School | Res Ed | Residential Ed. 365 | 3 | 5154C | 365 | $ 217,118.11 | $ 594.84 | |
| Brandon Residential Treatment Center | Res Ed | Intensive Res. | 12 | 5160D | 365 | $ 173,729.76 | $ 475.97 | |
| Brandon Residential Treatment Center | Day | Intensive Day | 11 | 5160C | 216 | $ 56,570.74 | $ 261.90 | |
| Broccoli Hall, Inc. | Day | Corwin-Russell | 01 | 5165A | 180 | $ 36,805.19 | $ 204.47 | |
| Camp Sunshine Day | Day | Reed Academy Day | 2 | 5947C | 216 | $ 58,854.99 | $ 272.52 | |
| Camp Sunshine Day | Res Ed | Reed Academy | 1 | 5947A | 261 | $ 77,183.35 | $ 295.72 | |
| Cardinal Cushing School & Training Ctr. | Day | Braintree St. Coletta | 11 | 6012A | 216 | $ 73,441.78 | $ 340.01 | |
| Cardinal Cushing School & Training Ctr. | Day | Day/Vocational | 1 | 5296A | 216 | $ 73,070.59 | $ 338.29 | |
| Cardinal Cushing School & Training Ctr. | Res Ed | Residential | 9 | 5296C | 365 | $ 196,640.70 | $ 538.74 | |
| Carroll School | Day | Carroll School | 01 | 5209A | 180 | $ 38,919.39 | $ 216.22 | |
| Center for Applied Behavioral Insctuction | Day | Day Program | | 5224A | 226 | $ 87,528.72 | $ 387.30 | |
| Center for School Crisis Inter. & Assess. | Day | Center School | 01 | 5227B | 220 | $ 74,245.56 | $ 337.48 | |
| Children's Study Home | Day | Mill Pond Day Program | 06 | 5249A | 216 | $ 48,865.24 | $ 226.23 | |
| Clarke School for the Deaf | Day | Day Education | 1 | 5257A | 180 | $ 44,450.90 | $ 246.95 | |
| Clarke School for the Deaf | Day | Preschool | 3 | 5257B | 198 | $ 36,434.36 | $ 184.01 | |
| Clarke School for the Deaf | Day | Clarke School East | 4 | 5257D | 192 | $ 35,109.91 | $ 182.86 | |
| Clearway School, Inc. | Summer | Summer | 02 | 5258B | 24 | $ 5,399.64 | $ 224.99 | |
| Clearway School, Inc. | Day | 766 School | 01 | 5258A | 180 | $ 46,737.44 | $ 259.65 | |
| **Agency Name** | Program Type | Program Name | UFR Program # | DESE Program Code | Days of Operation | Fiscal Year 2017 | | Notes |
| | | | | | | Annual Price | Daily Price | |
| Community Therapeutic Day School | Summer | Summer | 02 | 5265B | 20 | $ 6,638.81 | $ 331.94 | |
| Community Therapeutic Day School | Day | Day School | 01 | 5265A | 180 | $ 74,614.64 | $ 414.53 | |
| | | | | | | | | |
| COMPASS, Inc. | Day | Short Term Crisis | 20 | 5110B | 180 | $ 28,607.04 | $ 158.93 | |
| COMPASS, Inc. | Summer | Summer | 21 | 5110A | 24 | $ 7,206.49 | $ 300.27 | |
| Cotting School, Inc. | Day | Cotting Day | 1 | 5274A | 180 | $ 75,457.11 | $ 419.21 | |
| Cotting School, Inc. | Summer | Cotting Summer | 2 | 5274B | 25 | $ 7,266.16 | $ 290.65 | |
| Cotting School, Inc. | Residential | Hopehouse | 5 | 5274E | 180 | $ 91,813.94 | $ 510.08 | |
| Crossroads School Children, Inc. | Day | Crossroads School | 2 | 5272A | 226 | $ 103,792.89 | $ 459.26 | |
| Crystal Springs, Inc. | Res Ed | Main Program | 01 | 5297A | 365 | $ 269,480.66 | $ 738.30 | |
| Cutchins Programs for Children & Fam. | Day | New Directions | 02 | 5811A | 218 | $ 55,256.17 | $ 253.47 | |
| Devereux Foundation of Mass., Inc. | Res Ed | Resid. Treatment | 01 | 5324A | 365 | $ 149,875.14 | $ 410.62 | |
| Devereux Foundation of Mass., Inc. | Res Ed | West Meadow | 02 | 5324B | 365 | $ 174,770.28 | $ 478.82 | |
| Devereux Foundation of Mass., Inc. | Day | Day Program | 07 | 5324P | 216 | $ 49,069.78 | $ 227.17 | |
| Dr. Franklin Perkins School, Inc. | Res Ed | Intensive | 01 | 5887A | 365 | $ 200,615.25 | $ 549.63 | |
| Dr. Franklin Perkins School, Inc. | Day | Day Program | 07 | 5887B | 218 | $ 64,595.24 | $ 296.31 | |
| | Res Ed | | | | | | | |
| | Res Ed | | | | | | | |
| F. L. Chamberlain School, Inc. | Res Ed | 365 Day Residential | 02 | 5238F | 365 | $ 120,176.19 | $ 329.25 | |
| F. L. Chamberlain School, Inc. | Day | Day | 04 | 5238E | 216 | $ 58,227.55 | $ 269.57 | |
| Fall River Deaconess, Inc. | Res Ed | Residential Program | 01 | 5803A | 365 | $ 158,487.45 | $ 434.21 | |
| Franciscan Children's Hospital | Day | Kennedy Day | 1 | 5582A | 200 | $ 85,167.24 | $ 425.84 | 1/1/17 |
| Hopeful Journeys Education Center, Inc | Day | Hopeful Journeys | 1 | 5415A | 216 | $ 112,962.80 | $ 522.98 | |
| Hillcrest Educational Centers, Inc. | Res Ed | Autism Spectrum Disor | 10 | 5088G | 365 | $ 326,859.61 | $ 895.51 | |
| Hillcrest Educational Centers, Inc. | Res Ed | Hillcrest | 01 | 5088D | 365 | $ 191,385.99 | $ 524.35 | |
| Hillcrest Educational Centers, Inc. | Res Ed | Intensive Tx Unit | 05 | 5088E | 365 | $ 309,376.00 | $ 847.61 | |
| Hillcrest Educational Centers, Inc. | Day | Housatonic Academy | 06-1 | 5088F | 216 | $ 51,328.43 | $ 237.63 | |



| Agency Name | Program Type | Program Name | UFR Program # | DESE Program Code | Days of Operation | Fiscal Year 2017 Annual Price | Fiscal Year 2017 Daily Price | Notes |
|---|---|---|---|---|---|---|---|---|
| Perkins School for the Blind | Day | Blind | 1 | 5889D | 210 | $ 62,907.15 | $ 299.56 | |
| Perkins School for the Blind | Day | Multi-Impaired | 3 | 5889K | 210 | $ 112,458.50 | $ 535.52 | |
| Perkins School for the Blind | Day | Severely Impaired | 7 | 5889M | 210 | $ 138,113.41 | $ 657.68 | |
| Perkins School for the Blind | Day | Deaf/Blind/Multi-Impa | 5 | 5889J | 210 | $ 137,411.59 | $ 654.34 | |
| Perkins School for the Blind | Res Ed | Multi-Impaired | 4 | 5889E | 210 | $ 224,567.39 | $ 1,069.37 | |
| Perkins School for the Blind | Res Ed | Severely Impaired | 8 | 5889G | 210 | $ 307,856.54 | $ 1,465.98 | |
| Perkins School for the Blind | Res Ed | Deaf/Blind/Multi-Impa | 6 | 5889H | 210 | $ 274,823.19 | $ 1,308.68 | |
| Perkins School for the Blind | Res Ed | Blind | 2 | 5889B | 210 | $ 142,681.91 | $ 679.44 | |
| Professional Ctr. for Handicapped Child. | Day | Day Program | 01 | 5253A | 198 | $ 83,261.06 | $ 420.51 | |
| Protestant Guild for Human Services/DBA The Guild for Human Services | Day | Learning Center Day | 1 | 5915A | 234 | $ 91,572.63 | $ 391.34 | |
| Protestant Guild for Human Services/DBA The Guild for Human Services | Res Ed | Learning Center Res | 2 | 5815B | 365 | $ 249,554.76 | $ 683.71 | |
| | | | | | | | | |
| | | | | | | | | |
| Realizing Children's Strengths | Day | Intensive Day | 01 | 5940A | 221 | $ 170,811.36 | $ 346.66 | |
| Realizing Children's Strengths | Day | Day Ed | 02 | 5940R | 221 | $ 87,509.33 | $ 396.15 | |
| Riverside Community Care | Day | Riverside Life Skills | 16 | 5960A | 226 | $ 59,180.11 | $ 261.86 | |
| | | | | | | | | |
| Saint Ann's Home, Inc. | Day | St. Ann's Day School | 01 | 6002C | 180 | $ 50,310.04 | $ 279.50 | |
| Saint Ann's Home, Inc. | Res Ed | St. Ann's Residential | 08 | 6002B | 365 | $ 174,604.69 | $ 478.37 | |
| Saint Ann's Home, Inc. | Summer | Summer Day | 8 | 6002D | 36 | $ 8,323.25 | $ 231.20 | |
| Schools for Children | Day | Dearborn Academy | 01 | 5306B | 180 | $ 68,447.07 | $ 380.26 | |
| Schools for Children | Summer | Dearborn Summer | 03 | 5306C | 30 | $ 5,404.62 | $ 180.15 | |
| Schools for Children | Day | Seaport Campus | 05 | 5306D | 180 | $ 65,729.05 | $ 365.16 | 3/1/17 |
| SD Associates, LLC. | Day | Foundations Pioneer Valley | | 6056A | 241 | $ 109,069.89 | $ 452.57 | 2/1/17 |
| Seven Hills Foundation, Inc. | Day | Seven Hills Academy | 02 | 5998F | 232 | $ 50,717.84 | $ 218.61 | |
| Seven Hills Foundation, Inc. | Day | Groton - Clin Nursery | 79 | 5242A | 251 | $ 47,001.99 | $ 187.26 | |
| Seven Hills Foundation, Inc. | RES Ed | Stetson School | 610 | 6120A | 365 | $ 192,620.36 | $ 527.73 | |
| Specialized Education Services, Inc. | Day | High Road School of M | 1 | 5177G | 180 | $ 38,251.95 | $ 212.51 | |
| Specialized Education Services, Inc. | Summer | High Road School of MA. | | 5177H | 30 | $ 5,989.37 | $ 199.65 | |
| Springdale Education Center | Day | Springdale Ed. Center | 01 | 5227A | 220 | $ 69,428.17 | $ 315.58 | |
| St. Vincent's Home | Res Ed | St. Vincent's Home | 01 | 6040A | 365 | $ 169,524.68 | $ 464.45 | |
| St. Vincent's Home | Day | Spec. Ed. Day | 09 | 6040C | 216 | $ 56,894.74 | $ 263.40 | |
| Stevens Children's Home | Day | Stevens Home | | 6121B | 224 | $ 58,097.58 | $ 259.36 | |
| Stevens Children's Home | Res Ed | Stevens Home Day Pro | 1 | 6121A | 365 | $ 171,157.03 | $ 468.92 | |

| Agency Name | Program Type | Program Name | UFR Program # | DESE Program Code | Days of Operation | Fiscal Year 2017 Annual Price | Fiscal Year 2017 Daily Price | Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| Walker, Inc. | Day | Beacon High School | 07 | 6245D | 198 | $ 55,465.23 | $ 280.13 | |
| Walker, Inc. | Day | Walker School | 02 | 6245A | 216 | $ 85,990.48 | $ 398.10 | |
| Walker, Inc. | Res Ed | Intensive | 05 | 6245C | 365 | $ 238,134.08 | $ 652.42 | |
| Wayside Youth and Family Support Ntwk. | Res Ed | Wayside BTR | 2.0 | 5985A | 365 | $ 169,670.92 | $ 464.85 | |
| Wayside Youth and Family Support Ntwk. | Day | Wayside Academy | 3.0 | 5985C | 220 | $ 54,558.85 | $ 247.99 | |
| Whitney Academy, Inc. | Res Ed | Intensive | 2 | 6257B | 365 | $ 236,473.74 | $ 647.87 | |
| Willie Ross School for the Deaf | Day | Day | 01 | 5986C | 180 | $ 55,729.40 | $ 309.61 | 10/1/2016 |
| Willow Hill School | Day | Willow Hill School | 1 | 6052A | 180 | $ 51,855.10 | $ 288.08 | |
| Youth Opportunities Upheld | Day | Educational Prog. | 19 | 5995B | 216 | $ 38,127.51 | $ 176.52 | |
| Youth Opportunities Upheld | Res Ed | Cottage Hill Academy | 34.1 | 5995C | 365 | $ 183,776.05 | $ 503.50 | |
| | | | | | | | | |
| Youth Villages-Germaine Lawrence, Inc. | Day | Day Education | 11 | 6006D | 216 | $ 58,324.55 | $ 270.02 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| THIS PRICE LIST IS UPDATED REGULARLY. | | | | | | | | |

Notes:
1. Program reconstruction requested pursuant to 808 CMR 1.06(3).
2. Special Circumstances requested pursuant to 808 CMR 1.06(7)(c).
3. Extraordinary Relief Requested pursuant to 808CMR 1.06 (4)(a).
4. New Program



| Agency Name | Type | Name | Program # | DESE Program Code | Days of Operation | Fiscal Year 2017 | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Annual Price | Daily Price | |
| Home for Little Wanderers | Day | Southeast Campus Day | 46 | 5095B | 216 | $ 68,531.70 | $ 317.28 | |
| Home for Little Wanderers | Res Ed | Southeast Campus Res | 45 | 5095A | 365 | $ 205,432.24 | $ 562.83 | |
| Home for Little Wanderers | Day | Longview Day Program | 8 | 5789A | 211 | $ 75,143.48 | $ 437.66 | 8 (FY17) |
| Home for Little Wanderers | Res Ed | Long View Residential | 7 | 5789B | 365 | $ 163,367.21 | $ 448.12 | 8 (FY17) |
| Horace Mann | Day | Darnell School | 25 | 5488A | 221 | $ 89,907.06 | $ 406.82 | |
| Institute of Professional Practice | Day | Durham Center for Ed. | 80 | 5530C | 216 | $ 84,329.96 | $ 390.42 | |
| Italian Home for Children, Inc. | Res Ed | Italian Home Res | 01 | 5534A | 365 | $ 183,709.48 | $ 503.30 | |
| Italian Home for Children, Inc. | Day | Italian Home Day | 03 | 5534B | 220 | $ 80,016.98 | $ 363.71 | |
| James Farr Academy | Day | Farr Academy | 1 | 5381A | 180 | $ 75,635.87 | $ 420.20 | |
| James Farr Academy | Summer | Farr Academy Summer | 4 | 5381C | 25 | $ 7,791.46 | $ 311.66 | |
| Judge Baker Children's Center, Inc. | Summer | Manville Summer | 2 | 5097B | 20 | $ 6,086.65 | $ 304.33 | |
| Judge Rotenberg Educational Center | Day | Judge Rotenberg Day | 03 | 5120B | 185 | $ 79,381.14 | $ 429.41 | 13 (FY17) |
| Judge Rotenberg Educational Center | Res Ed | Judge Rotenberg | 01 | 5120A | 365 | $ 253,788.03 | $ 695.31 | |
| Justice Resource Institute | Res Ed | Berkshire Meadows | 02 | 5127C | 365 | $ 216,576.74 | $ 593.36 | |
| Justice Resource Institute | Res Ed | Meadowridge | 13 | 5997F | 365 | $ 194,945.82 | $ 534.10 | |
| Justice Resource Institute | Day | Victor School | 11 | 5127D | 216 | $ 53,861.56 | $ 249.36 | |
| Justice Resource Institute | Day | Anchor Academy | 79 | 5992D | 198 | $ 52,144.44 | $ 263.36 | |
| Justice Resource Institute | Day | Granite Day Ed | 01 | 5695A | 202 | $ 62,255.59 | $ 308.20 | |
| Landmark Foundation | Day | Landmark Resource Day | 03 | 5607B | 240 | $ 92,401.53 | $ 385.60 | 4 (FY17) |
| Landmark Foundation | Day | Landmark Day | 01 | 5607A | 180 | $ 52,596.03 | $ 292.20 | |
| Landmark Foundation | Res Ed | Landmark Residential | 02 | 5607B | 240 | $ 69,027.18 | $ 391.76 | |
| Latham Centers, Inc | Res Ed | Intensive | 5 | 5957C | 365 | $ 229,294.02 | $ 628.20 | 2/1/17 |
| Latham Centers, Inc | Day | Day Ed | 2 | 5819M | 180 | $ 80,460.44 | $ 446.97 | 2 (FY18) |
| Latham Centers, Inc | Res Ed | New Residential | 1 | 5819 | 365 | $ 241,113.90 | $ 660.58 | 1 (FY18) |
| Learning Ctr. for the Deaf | Day | Day | 1 | 5617G | 198 | $ 58,088.92 | $ 293.38 | 2/1/17 |
| Learning Ctr. for the Deaf | Day | Intensive Day | 2 | 5617H | 198 | $ 81,815.47 | $ 413.21 | |
| Learning Ctr. for the Deaf | Res Ed | Residential | 3 | 5617I | 198 | $ 106,322.49 | $ 536.98 | 2/1/17 |
| Learning Ctr. for the Deaf | Res Ed | Walden | 4 | 5617B | 365 | $ 322,099.00 | $ 882.46 | 3/1/17 |
| Lighthouse School | Day | Comp. Services Prog. | 2 | 5498B | 180 | $ 71,090.75 | $ 394.95 | |
| Little People's School | Day | Learning Prep School | 01 | 5643A | 180 | $ 41,624.49 | $ 231.25 | |
| MAB Community Services | Day | IVY Street School Day P | 6 | 5685C | 246 | $ 95,760.71 | $ 389.27 | |
| MAB Community Services | Res Ed | IVY Street School | 4 | 5685B | 365 | $ 216,272.46 | $ 592.53 | |
| Margaret Gifford School | Day | Gifford School | 1 | 5440A | 180 | $ 60,176.52 | $ 334.31 | |
| Margaret Gifford School | Summer | Gifford Summer | 2 | 5440B | 20 | $ 5,558.50 | $ 277.93 | |
| Mass. Found. for Learning Disabilities | Day | White Oak School | 01 | 5049A | 180 | $ 38,606.61 | $ 214.48 | |

| Agency Name | Type | Program Name | Program # UFR | DESE Program Code | Days of Operation | Fiscal Year 2017 | | Notes |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Annual Price | Daily Price | |
| May Institute | Day | Randolph Day | 5 | 5706E | 242 | $ 94,082.54 | $ 388.77 | |
| May Institute | Res Ed | Randolph Res. | 3 | 5706B | 365 | $ 216,906.28 | $ 594.26 | |
| May Institute | Day | Brockton Rehabilitativ | 19 | 5706G | 242 | $ 112,351.64 | $ 464.26 | |
| May Institute | Res Ed | Brockton Rehabilitative | 20 | 5706H | 365 | $ 243,440.04 | $ 666.96 | |
| May Institute | Day | West Springfield | 17 | 5706N | 222 | $ 107,187.63 | $ 482.83 | |
| McAuley Nazareth Home for Boys | Res Ed | McAuley Nazareth | 01 | 5709B | 365 | $ 143,618.78 | $ 393.48 | |
| McAuley Nazareth Home for Boys | Summer | Nazareth Day | 03 | 5709A | 216 | $ 32,882.52 | $ 152.23 | |
| McLean Hospital, Inc. | Day | Arlington-Academy | 01Mc | 5036A | 198 | $ 68,352.76 | $ 345.22 | |
| McLean Hospital, Inc. | Day | CNS | 02Mc | 5036J | 216 | $ 99,284.28 | $ 459.65 | |
| McLean Hospital, Inc. | Day | Pathways to Indep. | 03 | 5036K | 216 | $ 52,952.35 | $ 245.15 | 3 (FY17) |
| Melmark, Inc | Res Ed | Melmark N E | 01 | 5730B | 365 | $ 251,779.58 | $ 689.81 | 4 (FY17) |
| Melmark, Inc | Day | Melmark Day | 04 | 5730C | 237 | $ 109,632.49 | $ 462.67 | 4 (Fv 17) |
| Merrimac Heights Academy | Day | Merrimac Heights | 5734A | | 180 | $ 70,956.97 | $ 394.21 | |
| Milestones, Inc. | Day | Milestones Day School | 5 | 5360A | 216 | $ 91,284.69 | $ 422.61 | |
| Nashoba Learning Group, Inc. | Res Ed | Nashoba Learning | 03 | 5752A | 216 | $ 104,345.00 | $ 483.08 | |
| N. E. Adolescent Research Institute | Day | N.E.A.R.I. | 1 | 5760A | 220 | $ 63,965.13 | $ 290.75 | |
| New England Academy | Day | NE Academy | 01 | 5788A | 198 | $ 60,970.81 | $ 307.93 | |
| New England Center for Children | Res Ed | N.E.C.C. Severe | 03 | 5343C | 365 | $ 332,912.48 | $ 912.09 | 10/1/16 |
| New England Center for Children | Res Ed | N.E.C.C. Residen | 02 | 5343B | 365 | $ 228,769.64 | $ 626.77 | 10/1/16 |
| New England Center for Children | Res Ed | Intermediate | 19 | 5343E | 365 | $ 307,368.47 | $ 842.11 | |
| New England Center for Children | Day | Intensive Instruction | 13 | 5343D | 226 | $ 114,746.14 | $ 507.73 | 10/1/16 |
| New England Pediatric Nursing Home | Day | Pediatric | 02 | 5113A | 251 | $ 58,862.17 | $ 234.51 | |
| New England Pediatric Nursing Home | Res Ed | Day Pro Program | | | | $ 47,968.58 | $ 191.98 | 5 (FY 18) |
| Northeast Center for Youth and Families | Day | TCHS | 5 | 5980A | 180 | $ 50,084.98 | $ 278.25 | 1/1/17 |
| Northeast Center for Youth and Families | Summer | Summer | 7 | 5980B | 31 | $ 11,291.47 | $ 364.24 | 1 (FY17) |