## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

ANCHORAGE SCHOOL DISTRICT,

        Appellant,

    v.

M.G., and his parents Betsy and Brian G.,

        Appellees.

Case No. 3:17-cv-00157-SLG

### DECISION AND ORDER

This case is an administrative appeal under the Individuals with Disabilities Education Act ("IDEA").[1] Appellant Anchorage School District ("ASD") appeals from a Hearing Officer's decision to require ASD to pay for disabled student M.G.'s residential placement at Perkins School for the Blind. ASD's corrected opening brief was filed at Docket 82-1. Appellees filed their brief in opposition at Docket 68; ASD filed its reply brief at Docket 81. Oral argument was held on January 31, 2018.[2] For the following reasons, the Hearing Officer's decision will be affirmed.

### STANDARD OF REVIEW

A court's review of an IDEA determination "differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative

---

[1] 20 U.S.C. § 1400 *et seq.*

[2] Docket 130 (Minute Entry for Oral Argument).

record and are held to a highly deferential standard of review."[3]  Judicial review is less

deferential in IDEA cases.  However, "due weight" must be given to the administrative

decision below and courts must not "substitute their own notions of sound educational

policy for those of the school authorities which they review."[4]  A court should base its

decision on the preponderance of the evidence found in the record of the administrative

proceedings and any additional evidence that supplemented the record.[5]

"In determining the degree of deference owed to the administrative findings, this

court, in recognition of the expertise of the administrative agency, must consider the

findings carefully and endeavor to respond to the hearing officer's resolution of each

material issue."[6]  "After such consideration, the court is free to accept or reject the findings

in part or in whole."[7]  "The amount of deference accorded the hearing officer's findings

increases where they are thorough and careful."[8]  "The determinations of a state agency

are entitled to greater deference where . . . the agency finds that one of its school systems

---

[3] *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).

[4] *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817 (9th Cir. 2007) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)).

[5] 20 U.S.C. § 1415(i)(2)(C); *see also* Docket 69 (Order Granting ASD's Motion to Supplement the Record).

[6] *Adams v. State of Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999) (internal quotation and citation omitted).

[7] *Ash v. Lake Oswego Sch. Dist., No. 7J*, 980 F.2d 585, 587–88 (9th Cir. 1992) (quoting *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984)).

[8] *Capistrano Unified Sch. Dist. v. Wartenberg By and Through Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).

has not complied with the state's implementation of the IDEA."[9]

Judicial review of a Hearing Officer's decision involves two steps. "First, the court must determine whether the rigorous procedural requirements of IDEA have been met. Second, the court must determine whether the state has met the substantive component of IDEA—the requirement that the state provide an 'appropriate' education."[10]

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1441 because this is a civil action in which the causes of action arise under the laws of the United States, primarily the IDEA.

## BACKGROUND

Under the IDEA, all children with disabilities must have available to them a free appropriate public education ("FAPE") "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."[11]  To achieve this goal, an individualized education program ("IEP") is developed, which addresses the specific and particular needs of each disabled child.[12]

1. Factual Background

M.G. was born in 1999.  He was first diagnosed with autism when he was two-and-

---

[9] *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist. Office of Admin. Hearings*, 652 F.3d 999, 1005 (9th Cir. 2011).

[10] *Union Sch. Dist.*, 15 F.3d at 1524.

[11] 20 U.S.C. § 1400(d)(1)(A).

[12] 20 U.S.C. § 1412(a)(4).

a-half years old.[13]  M.G. has a severe, nonverbal intellectual disability.[14]  He also has severe gastrointestinal problems and food allergies.[15]

In elementary school, it became apparent that M.G. would not be speaking and needed an alternative way to communicate.[16]  M.G. was introduced to the Dynovox, a speech communication device that generates speech based on various photos selected by the user.[17]  Throughout M.G.'s primary education, he successfully used such visual methods to assist with his learning.[18]

In the fall of 2014, M.G. began high school at West High School in Anchorage, Alaska.[19]  M.G. had a difficult time with the transition.[20]  In March 2015, M.G. began to poke his eye with his finger.[21]  His mother testified that he was "screeching, screaming, kind of banging on walls . . . poking his eye, banging on his head."[22]  On March 24, 2015, ASD conducted a routine distance vision test on M.G., which M.G. failed in both eyes.[23]

---

[13] R. 3972. (Testimony of M.G.'s Mother).  This order cites to the pagination of the Administrative Record, which is filed at Docket 29.

[14] R. 2003 (Letter from LaTouche Pediatrics dated Apr. 21, 1999).

[15] R. 1858 (Perkins Evaluation); *see also* R. 2287 (April 16, 2015 IEP).

[16] R. 3999 (Testimony of M.G.'s Mother).

[17] R. 3999–4000.

[18] R. 3982–83, 4005–06.

[19] R. 2287.

[20] R. 2287.

[21] R. 4029–30. (Testimony of M.G.'s Mother).

[22] R. 4030.

[23] R. 2282 (Student Health Profile Report dated March, 24, 2015).

ASD did not inform M.G.'s parents ("Parents") of these test results at that time.[24]  M.G.'s mother testified that it wasn't until the winter of 2016 when she first saw that vision report.[25]

On April 16, 2015, M.G.'s IEP team met to update his IEP.[26]  M.G.'s recent failed distance vision test was not mentioned.  M.G.'s April 2015 IEP included M.G.'s need for visual supports.  Parents' comments on that IEP noted that "[s]upport of [M.G.]'s visual learning needs through structure and visual supports (including visual schedules, pictures and his Dynovox) are necessary and critical for [M.G.] to learn."[27]

In April 2015, M.G. was seen by a pediatric ophthalmologist, Robert Arnold, M.D. Dr. Arnold did not find anything apparently wrong with M.G.'s eyes at that time.[28]  But M.G.'s mother testified that "the eye poking, the head banging, the agitation . . . continued."[29]  In the summer of 2015, Parents received reports from M.G.'s summer camp that M.G. was running into things.[30]

In August 2015, Parents took M.G. back to Dr. Arnold, who then determined that

---

[24] R. 4033–34 (Testimony of M.G.'s Mother).

[25] R. 4033.

[26] R. 2286–2308.

[27] R. 2289; see also R. 2308 ("[T]he educational placement [is] in the school the student would attend if the student did not have a disability. . . . [M.G.] requires individual care for the entire school day to be provided by a special education teacher, related service provider or teacher assistant attending to no more than 3 intensive students.").

[28] R. 4032.

[29] R. 4031.

[30] R. 4042–43 (Testimony of M.G.'s Mother).

M.G. had significant vision field loss. He diagnosed M.G. with a slow degenerative disease that would progressively tunnel his vision and eventually lead to near total blindness.[31] M.G.'s mother promptly informed ASD staff and requested additional support for M.G. On August 25, 2015, the Blind and Visually Impaired ("BVI") teacher at West High School, Victoria Ackerman, recognized "the importance of getting tactile communication system/supports in place ASAP while [M.G.] . . . can take advantage of whatever vision [he] has while he still has it."[32] Between September 2015 and January 2016, Ms. Ackerman provided M.G. a total of 12.5 hours of cane training and a functional visual assessment.[33]

Meanwhile, promptly after receiving Dr. Arnold's diagnosis in August, 2015, M.G.'s mother was concerned that ASD could not meet M.G's educational needs given his autism and newly diagnosed, rapidly developing vision loss. M.G.'s mother began looking for education alternatives for her son.[34] M.G.'s mother contacted local service agencies and schools across the country that work with students with multiple disabilities and vision loss.[35] She learned Perkins School for the Blind ("Perkins") was the only school that served children with blindness and multiple disabilities, including severe autism, that had a weekend residential program.[36]

---

[31] R. 2005–08 (Dr. Arnold Treatment Records dated Sept. 2, 2016); R. 4049–50.

[32] R. 2361 (Email exchange between M.G.'s mother and ASD staff).

[33] R. 2374–77 (Ms. Ackerman's Assessment Notes); R. 5421, 5437 (Testimony of Ms. Ackerman).

[34] R. 4072–90 (Testimony of M.G.'s Mother).

[35] R. 4077–86; *see also* R. 1934–37 (Letter to University of Texas re: Admission).

[36] R. 4077–86.

In early September 2015, M.G.'s mother contacted Perkins and placed M.G. on the waitlist for an independent educational evaluation ("IEE").[37] In September and October 2015, M.G.'s mother completed the application packet to enroll M.G. as a student at Perkins.[38] She did not inform ASD that she had sought to enroll M.G. at Perkins until nearly one year later in the summer of 2016.[39]

Meanwhile, in December 2015, M.G. had an eye evaluation under anesthesia in Denver, Colorado by Robert Enzehauer, M.D., a pediatric ophthalmologist. Dr. Enzehauer determined that:

> retinal function was not the problem, but rather rapidly progressive optic nerve atrophy. . . . There is no question that extensive vision rehabilitation services will be most effective for [M.G.] in the next 1-2 years, before his visual function is markedly deteriorated even more. The services that the family are seeking for [M.G.] will require an urgent combination and sequence of special, interdisciplinary, or generic assistance, supports or other services that are individually planned and coordinated. Without such aggressive and coordinated behavior and vision rehabilitation services, [M.G.]'s risk of being institutionalized is greatly increased.[40]

Upon the request of Parents, ASD agreed to pay for the IEE at Perkins on January 29, 2016.[41] In March 2016, M.G. and Parents travelled to Perkins for M.G.'s IEE.[42] The visit also included an admission tour apparently unbeknownst to ASD at that time.[43]

---

[37] R. 4082–83.

[38] R. 1925 (Required Paperwork Checklist).

[39] R. 3280 (Letter from Perkins to ASD dated July 29, 2016).

[40] R. 2014–16 (Dr. Enzehauer's Letter dated Jan. 29, 2016); *see also* R. 4053–57.

[41] R. 2397 (Letter from ASD Granting Parents' Request for IEE dated Jan. 29, 2016).

[42] R. 2437 (Letter from Perkins' Evaluation Coordinator dated May 18, 2016); R. 4091.

[43] R. 4755–56 (Testimony of Cindy Anderson, ASD Executive Director of Special Education).

Perkins' evaluation was finalized and sent to ASD on May 18, 2016.[44] It totaled 71 pages and included reports from a school psychologist, a teacher of students with visual impairments, a speech-language pathologist, an occupational therapist, an orientation and mobility specialist, a work activities teacher, a board certified behavioral analyst, and a home and personal management teacher.[45] The reports are silent on residential placement; rather, the IEE appears aimed at providing ASD with recommendations for educational programming for M.G. at home and at an in-district school.[46]

On April 28, 2016, M.G.'s IEP team met to update M.G.'s IEP.[47] The IEP team meetings included Parents, M.G.'s special education teacher, the general education teacher, an ASD representative, the speech/language pathologist, the occupational therapist, the adaptive physical education teacher, the BVI teacher, the department chair, the assistive technologist, counsel for Parents, and counsel for ASD.[48] The IEP team did not finalize an IEP at the April 28th meeting but met again on May 11, 2016 and on May 18, 2016.[49] At the May 18th meeting, the IEP team had not yet received the Perkins' evaluation. However, at the end of the two hour meeting, the IEP was signed by all participants.[50] The May 2016 IEP provides that "[t]he nature and severity of [M.G.]'s

---

[44] R. 2437.

[45] R. 1851–1921 (Perkins Evaluation).

[46] *See* R. 1851–1921; R. 2437.

[47] R. 2398–99 (Invitation to Attend April 28, 2016 IEP Meeting).

[48] *See* R. 167 (IEP Signature of Participants dated Apr. 28, 2016).

[49] R. 168 (IEP Signature of Participants dated May 11, 2016); R. 169 (IEP Signature of Participants dated May 18, 2016).

[50] R. 169 (checking the boxes for "Transfer of Rights Letter has been sent," "Notice of Procedural

disability justifies residential placement as the least restrictive environment. The location will be administratively determined."[51]

Based on the May 18, 2016 IEP meeting, on May 24, 2016, ASD issued a Notice of Requirements and Procedural Safeguards. The notice referenced the "attached IEP" and states that "[t]he district will implement [M.G.]'s IEP, which includes a change of placement to residential treatment."[52] The notice states that the change to residential treatment was based on "parental request" and "an annual review." It further provides "[t]he team considered not changing placement to residential treatment, however, this was rejected due to the nature and severity of [M.G.]'s disability. . . . The team reached full consensus on residential placement. The location of residential treatment will be administratively determined."[53]

On June 8, 2016, the parties met again in an effort to determine the appropriate

---

Safeguards provided," and "Parent acknowledged Non-Diploma Track"); *see also* R. 167, 168 (no boxes checked).

[51] R. 197 (May 18, 2016 IEP). There are two versions of this IEP in the record. The May 24, 2016 version has "DRAFT VERSION" in the header of the IEP. R. 2412–36. The August 30, 2016 version no longer contains "DRAFT VERSION." *See* R. 169–97. The August 30, 2016 version also contains the signatures of the IEP team. R. 169. It does not appear that there are any substantive differences between the two versions. *See* R. 5439–40 (Testimony of Parents' Counsel) ("[I]t is the same IEP. The only difference is that upper left hand corner, the date at which it was essentially adopted or modified within the school's computer system."). The Court references the signed version at R. 169–197 throughout this order.

[52] R. 198 (Notice Requirement & Procedural Safeguards dated May 24, 2016). ASD calls the May 24, 2016 notice a Prior Written Notice ("PWN"). Docket 82-1 at 34. However, the May 24, 2016 notice is not a PWN. *Compare* R. 198 *with* R. 133–35; R. 156–57; R. 3494. *Compare* 20 U.S.C. §§ 1415(b)(3), (c)(1) (prior written notice) *with* 20 U.S.C. § 1414(d) (individualized education programs) *and* 20 U.S.C. § 1415(d) (procedural safeguards notice); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005).

[53] R. 198.

residential placement. M.G.'s mother provided information on various schools, including Washington State School for the Blind, Maryland School for the Blind, Perkins School for the Blind, Texas School for the Blind and Visually Impaired, and Florida School for the Deaf and Blind.[54] M.G.'s mother testified that ASD did not bring information to the meeting regarding any residential placement options; nor did ASD provide any proposals for residential placement at the June 2016 meeting.[55] Of the schools considered, M.G.'s mother stated Washington State School for the Blind did "not have services available to meet the needs of a BVI student with classic autism."[56] Florida School for the Deaf and Blind and Texas School for the Blind served only in-state residents. Maryland School for the Blind did not provide any services on the weekends, meaning M.G. would need to leave the school and live at a group home on the weekends. At the meeting, team members discussed how it would be very difficult for M.G. to transition every weekend to a group home.[57] Perkins was identified as the only school with a weekend program and the ability to serve severely autistic/visually-impaired students with appropriate full-time related services.[58] M.G.'s mother testified that by the end of the meeting, she believed the team had reached a consensus on M.G.'s residential placement at Perkins.[59] On July

---

[54] R. 2438–2501 (Information on Residential Placement Options); *see also* R. 4194–96 (Testimony of M.G.'s Mother).

[55] R. 4197.

[56] R. 2438.

[57] R. 4122 (Testimony of Speech Pathologist Cara Leckwold); R. 4200–01 (Testimony of M.G.'s Mother).

[58] R. 4199–4209 (Testimony of M.G.'s Mother).

[59] R. 4206–09.

29, 2016, Perkins sent a letter to ASD "confirm[ing] that Perkins is able to offer a program to [M.G.]"[60]

On August 11, 2016, ASD issued a PWN that informed Parents that it had "considered and has rejected parents' immediate request of Perkins School for the Blind without further mediated discussion." ASD listed the following concerns with Perkins: Perkins rarely transitions students back to their home school districts; Perkins is not a Medicaid enrolled facility; it is the farthest placement from M.G.'s home; and Perkins' tuition "substantially exceeds any other residential placement cost for district students."[61] The PWN did not propose an alternative residential placement for M.G. Rather, it proposed mediation during the week of August 15th "to collaboratively select a setting for [M.G.]'s residential placement."[62] Parents declined the proposal to mediate.[63]

On August 18, 2016, shortly before the start of the fall semester, ASD issued a second PWN, requesting that Parents reconsider mediation "before [M.G.] is admitted to the mutually selected residential setting[.]"[64] The PWN also proposed providing 10 hours weekly of homebound services in the weeks before admission. Parents declined the proposal.[65] M.G. did not return to West High School.[66]

---

[60] R. 2633 (Letter from Perkins Director of Admissions to ASD dated July 29, 2016).

[61] R. 3492–93 (PWN dated Aug. 11, 2016).

[62] R. 3492.

[63] R. 3494 (PWN dated Aug. 18, 2016).

[64] R. 3494.

[65] R. 4227–28 (Testimony of M.G.'s Mother).

[66] R. 4849 (Testimony of Cindy Anderson)

On September 2, 2016, ASD issued another PWN that proposed three actions: (1) complete an application to Arizona School for the Deaf and Blind to determine if M.G. was eligible to attend that school; (2) collaborate with Parents and the ARC program to provide applied behavioral analysis services; and (3) hire special education consultant Jennifer White to assist the parties in completing M.G.'s Evaluation and Summary and Eligibility Report ("ESER") and IEP based on the Perkins Evaluation.[67]  Parents testified that they completed an application to Arizona School for the Blind, but the school "formally declined to offer admission to [M.G.]"[68]

The parties met to discuss residential settings for M.G. on October 12, 2016.  The meeting was unsuccessful.[69]  On October 18, 2016, Parents wrote a lengthy letter to ASD, informing the district of their intent to unilaterally withdraw M.G. from ASD and enroll him at Perkins.[70]  On October 24, 2016, ASD made a settlement proposal to Parents to pay for M.G.'s attendance at Perkins from approximately November 1, 2016 through May 14, 2017.[71]  ASD's proposal provided "[f]or the first four weeks of M.G.'s attendance at

---

[67] R. 133–35 (PWN dated Sept. 2, 2016).

[68] R. 2697 (Letter from Parents to ASD's Director of Special Education dated Oct. 18, 2016); *see also* R. 4230 ("[The purpose of the PWN from September 2nd, 2016] was to complete an application to determine if [M.G] is eligible to – to attend Arizona School for the Blind."); R. 2990 (Email from Principal of Arizona School for the Blind dated Oct. 3, 2016) ("After speaking with parents and reviewing the materials that were submitted, I do not feel that we are the appropriate placement for this student due to his level of need and support.  The majority of students we serve are academic students who need intensive braille and Orientation and Mobility instruction.").

[69] R. 4325–26.

[70] R. 2692–2701. Parents' letter states "we are providing you with ten days' notice of our intent to withdraw [M.G.] from the Anchorage School District and unilaterally place him at Perkins School for the Blind and seek reimbursement from the district for the cost of tuition and services needed to provide a FAPE."  R. 2700.

[71] R. 145–54 (Proposed Settlement Agreement by ASD dated October 24, 2016); R. 4278 (Exhibit

Perkins, Perkins will implement M.G.'s May 2016 IEP."[72]   Parents did not accept this proposal because there was no spot for M.G. at Perkins at that time, among other concerns.[73]   On October 25, 2016, ASD issued a PWN seeking an immediate evaluation of M.G. prior to his withdrawal from the district.[74]   ASD indicated that it rejected "placement of [M.G.] without completion of the evaluation to determine his current baseline prior to his admission to Perkins."[75]   The only evaluation sought by ASD at that time was a Functional Behavioral Assessment ("FBA").[76]   ASD brought special education consultant Jennifer White to Anchorage to perform the evaluation, which took place with Parents' consent for five hours over two days in late October.[77]   Ms. White concluded that "[M.G.] would benefit from intensive programming" but that the "enormous adjustments [required for an out of state residential placement] is worrisome."[78]   Instead, contrary to the May 2016 IEP, she opined that "it would be markedly more beneficial to bring services

---

List).

[72] R. 146.

[73] R. 4342.

[74] R. 156–57 (PWN dated Oct. 26, 2016).

[75] R. 156.

[76] R. 2704–05 (Consent for Evaluation).  An FBA "is a comprehensive and individualized strategy to": (1) "identify the purpose or function of a student's problem behavior(s)"; (2) "develop and implement a plan to modify variables that maintain the problem behavior"; and (3) "teach appropriate replacement behaviors using positive interventions." http://www.ideapartnership.org/documents/ASD-Collection/asd-dg_Brief_FBA.pdf (last visited June 13, 2018).

[77] R. 436–450 (Ms. White's Evaluation of M.G.); R. 5328–29 (Testimony of Ms. White); R. 5564–65 (Testimony of Eudora Fraczek with ASD).

[78] R. 445.

to [M.G.]'s hometown" and "Perkins could provide ongoing consultation to this team as needed."[79]

On November 6, 2017, ASD requested additional evaluations.[80] The request included a proposed schedule of evaluations to begin on November 17, 2016 and invitations to an ESER meeting on December 14, 2016 and an IEP Development/Review meeting on December 16, 2016.[81] Parents responded by requesting that ASD provide a PWN that explained why the additional evaluations were necessary and for what purpose.[82] ASD did not file a PWN in response to that request; no additional evaluations were performed; and no ESER or IEP meetings were held in December 2016.

M.G. began attending Perkins on May 1, 2017, which is when a spot became available for him there.[83]

2. Procedural Background

On January 17, 2017, Parents filed a due process hearing request with the Alaska Department of Education and Early Development. They asserted two claims: (1) ASD failed to timely implement M.G.'s IEP by not selecting an appropriate residential

---

[79] R. 445.

[80] R. 1569 (Email from ASD dated Nov. 6, 2016).

[81] R. 1579–89 (Email from ASD dated Nov. 15, 2016). ASD requested the following evaluations: FBA/Behavioral, Social Emotional, Adaptive, Language/AT, OT/Sensory, Functional Vocational Assessment, and Vision. R. 1579. *See* R. 1597 (Re-evaluation Consent Form); *see also* 20 U.S.C. § 1414(a)(2) (reevaluations). Under § 1414(a)(2)(B)(i), a reevaluation shall occur "not more frequently than once a year, unless the parent and the local educational agency agree otherwise."

[82] R. 2812–13 (Email from Parents dated Nov. 18, 2016) ("[I]t seems evaluations and IEP meetings are premature.").

[83] Docket 10-1 at 4.

placement for him; and (2) ASD failed to provide a FAPE to M.G. in a timely manner. Parents requested that ASD be required to pay for M.G.'s tuition at Perkins as well as any additional costs associated with his admission.[84]

Hearing Officer Sheila Gallagher issued two pre-hearing orders that are at issue in this appeal. First, on March 3, 2017, ASD filed a Motion for Order to Continue Evaluations.[85] Officer Gallagher denied ASD's motion, finding that "[t]he delay and necessity of these additional evaluations has not been sufficiently explained. The[re] appears to have been ample opportunity for the district to request and perform the evaluations prior to this latest request."[86]

Second, Officer Gallagher granted Parents' motion *in limine* to exclude Jennifer White's opinion that an out-of-state residential placement was not appropriate for M.G.[87] The Hearing Officer struck the summary and recommendations portion of Ms. White's report and did not permit testimony on that topic by Ms. White.[88]

After a ten-day due process hearing, Officer Gallagher issued a written order on May 30, 2017. She held that Parents had "met the burden that the ASD failed to

---

[84] R. 6222–25 (Letter from Parents' Attorney to Special Education Dispute Resolution dated Jan. 17, 2017).

[85] R. 5992–6000 (Mot. for Order to Continue Evaluations).

[86] R. 6075 (Hearing Officer's Order re: Motion to Reconsider Additional Evaluations); *see also* R. 6349 (Tr. of Telephonic Status Conference).

[87] R. 3953–56 (Hearing Officer's Ruling on Mot. *in Limine*); *see also* R. 6082–89 (Parents' Mot. *in Limine*).

[88] R. 3953–54; *see also* R. 445–46 (Ms. White's Report at 10–11). Ms. White was permitted to testify about M.G.'s ability to generalize and transition. *See e.g.* R. 5363–70; 5401–05 (Testimony of Jennifer White).

implement student's IEP in a timely manner by not selecting a 'safe and appropriate residential placement.'"[89]  The Hearing Officer ordered ASD to pay for M.G.'s education at Perkins from the period from May 1, 2017 through February 17, 2018.[90]  She also directed the parties to determine by February 17, 2018 whether M.G. would be ready to return to ASD or would benefit from additional time at Perkins.[91]

On June 30, 2017, ASD appealed to the Alaska Superior Court.[92]  Parents removed the appeal to this Court on July 12, 2017.[93]  On appeal, ASD asserts that the Hearing Officer committed the following four errors: (1) concluding that ASD failed to implement M.G.'s May 2016 IEP in a timely manner, which ASD characterizes as a draft IEP only; (2) denying ASD's Motion to Continue Evaluations; (3) excluding portions of the expert report and testimony of Jennifer White; and (4) failing to apply the applicable law to Parents' unilateral placement of M.G. at Perkins.[94]

---

[89] Docket 10-1 at 15.

[90] *See* Docket 10-1 at 15–16.

[91] Docket 10-1 at 15–16. On January 19, 2018, Parents filed a Motion for Stay Put because the parties were unable to agree on whether M.G. should remain at Perkins after February 17, 2018. Docket 127 (Mot. for Stay Put).  On February 23, 2018, the Court granted the motion, finding that "[d]uring the pendency of the review of the Hearing Officer's decision, M.G.'s placement, absent agreement to the contrary, is Perkins School for the Blind."  Docket 158 (Order re Mot. for Stay Put) at 5.  The stay put order is currently on appeal to the Ninth Circuit. *See* Docket 166 (Notice of Appeal of Stay Put Order).

[92] R. 6146–47 (Notice of Appeal of Final Agency Decision).

[93] Docket 1 (Notice of Removal).

[94] Docket 82-1 at 31–32.

**DISCUSSION**

1. <u>Implementation of May 2016 IEP</u>

ASD first asserts that "[t]he Hearing Officer erred when she concluded that ASD failed to implement M.G.'s May 2016 Draft IEP in a timely manner."[95] ASD maintains that the Hearing Officer "erroneously treated M.G.'s May 2016 Draft IEP and its accompanying PWN as a completed IEP over ASD's objection."[96] Parents respond that any argument that the May 2016 IEP is not valid has been waived, and that "[b]oth parties have consistently treated the May 2016 IEP as a valid, binding IEP[.]"[97]

Generally, a court "will not review challenges to agency action raised for the first time on appeal."[98] Parents assert that "[a]t no time before ASD filed its appeal with the state superior court did ASD take the position that M.G.'s May 2016 IEP was not valid and binding on ASD because it was not 'final.'"[99] Because, as discussed below, the Court finds that the May 2016 IEP was legally enforceable as to a residential placement for M.G., the Court need not address whether this argument was waived.

The Hearing Officer found that the May 2016 IEP was binding on the parties with

---

[95] Docket 82-1 at 32.

[96] Docket 82-1 at 32.

[97] Docket 68 at 31.

[98] *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1023 (9th Cir. 2007).

[99] Docket 68 at 32. It appears that ASD's first reference to the IEP being a "draft IEP" was in its August 18, 2016 PWN. *See* R. 3494 ("Conven[e] [M.G.]'s former IEP team to complete administratively developed ESER and draft IEP. . . . [T]he District can, upon written authorization from parents or their counsel, implement the draft goals of the April 28, 2016 IEP developed by the West High School team[.]").

respect to the residential placement determination for M.G.[100]  Prior to the hearing, the

Hearing Officer issued an order, stating that "the issue of a residential placement was

determined by the IEP team. . . . [T]he issues of which of these schools, including

Perkins. . . . is on the table for decision at the hearing."[101]

M.G.'s May 2016 IEP provides "[t]he nature and severity of [M.G.]'s disability

justifies residential placement as the least restrictive environment. The location will be

administratively determined."[102]  The May 2016 IEP was signed by the entire IEP team.[103]

The notice issued on May 24, 2016, shortly after the May 2016 IEP meeting, describes

the document as "the attached IEP."  The notice also informs Parents that "the written

notice includes the IEP," and that "[t]he district will implement [M.G.]'s IEP, which includes

a change of placement to residential treatment."  The notice further provides:

> The team considered not changing placement to residential treatment,
> however, this was rejected due to the nature and severity of [M.G.]'s
> disability. . . . The team reached full consensus on residential placement.
> The location of residential treatment will be administratively determined."[104]

It is clear from the record that the May 2016 IEP was a binding determination of residential

placement for M.G. as determined by the IEP team.  At the due process hearing, ASD's

Senior Director of Special Education, Cindy Anderson, acknowledged the binding nature

---

[100] *See e.g.* Docket 10-1 at 7 ("The May 18, 2016 IEP (P. ex. 33) [R. 172–74] had four pages of suggestions for coping with student's vision loss. These were developed without the benefit of his evaluation at Perkins which was not received by the ASD until after the IEP was completed.").

[101] R. 6073 (Email from Hearing Officer to Parties dated March 29, 2017).

[102] R. 197.

[103] R. 169.

[104] R. 198.

of the May 2016 IEP.[105]

ASD asserts that the May 2016 IEP did not "include a statement of present level functioning" and therefore "cannot serve as a final IEP."[106]   However, upon review of the May 2016 IEP, it is apparent from the lengthy discussion regarding M.G.'s visual impairment found under the "Present Levels of Academic Achievement and Functional Performance" that the IEP team considered M.G.'s visual impairment and updated his IEP to include present level functioning regarding his visual impairment.[107]   Although the IEP team did not have the benefit of the Perkins evaluation in updating M.G.'s IEP, it appears that it was not necessary for the team to determine that M.G. needed residential placement.   The IEP team addressed M.G.'s present levels for his vision based on recent

---

[105] Ms. Anderson's testimony in relevant part is as follows:

> A: . . . It was, I believe the last day of school on the 18th, and – and fairly late in the afternoon, [Parents' attorney] had asked that they skip over goals and objectives and accommodations and go to placement.   And the team had determined residential.
> Q: Okay. And was that like the final word on that? I mean is that – so when you learned that information did you – is there a mechanism by which the District could have challenged that determination?
> A: Could we [have] challenged – no.
> Q: Okay.
> A. Not – no. I don't – when – when IEP teams meet and determine placement, no, unless we really – we – there are times that we've had teams go back and review because of additional information, but . . . ."

R. 5015. As discussed by Parents in their briefing, this is consistent with controlling Ninth Circuit case law. In *M.C. v. Antelope Valley*, the Circuit held, "[i]f the District discovered that the IEP did not reflect its understanding of the parties' agreement, it was required to notify [the student's parent] and seek her consent for any amendment. Absent such consent, the District was bound by the IEP as written unless it sought to re-open the IEP process and proposed a different IEP." 858 F.3d 1189, 1197 (9th Cir. 2017) (citing 20 U.S.C. §§ 1414 (d)(3)(D), (F)).

[106] Docket 82-1 at 33.

[107] *Compare* R. 2289–92 *with* R. 170–76.

medical reports given by Dr. Enzehauer dated December 2, 2015 and Dr. Arnold dated August 19, 2015.[108]   The May 2016 IEP adequately addressed M.G.'s present level functioning.

ASD also maintains that the May 2016 IEP is not valid because it does not specify the location for residential placement.[109]   20 U.S.C. § 1414(d)(1)(A)(i)(VII) provides that an IEP must include "the projected date for the beginning of the services and modifications . . . and the anticipated frequency, location, and duration of those services and modifications[.]"

ASD cites to a Fourth Circuit case, *A.K. ex rel. J.K. v. Alexandria City School Board* in support.[110]   In *A.K.*, the parents enrolled their child in a residential school in Massachusetts and the public school district agreed at that time to fund the portion of tuition equivalent to private day school placement.   The IEP team met to update the student's IEP for the following year and the district proposed that the student attend a private day school; the parents objected.   The IEP listed the child's placement as "Private Day School."   The parents refused to sign the IEP. The school district then proposed two specific private day schools, but the parents determined that neither school would serve the student's particular needs.   The parents elected to keep the child at the residential school.   They requested a due process hearing, seeking reimbursement for the tuition at the residential school on the ground that the district had failed to provide a FAPE and the

---

[108] *See* R. 172–74.

[109] Docket 82-1 at 33 (citing *Ravenswood City Sch. Dist. v. J.S.*, 870 F. Supp. 2d 780, 790 (N.D. Cal. 2012)); *cf. M. v. Falmouth Sch. Dep't*, 847 F.3d 19 (1st Cir. 2017).

[110] 484 F.3d 672 (4th Cir. 2007).

residential school was an appropriate placement. The trial court granted summary judgment to the school district.

On appeal, the Fourth Circuit reversed and remanded. It noted that the IDEA requires an IEP to specify the location at which services will be provided.[111] The Circuit Court held that the IEP's failure to identify a particular day school meant "the IEP was not reasonably calculated to enable [the student] to receive educational benefits."[112] The Fourth Circuit discussed how the parents had agreed that an appropriate private school could provide a FAPE, but at the IEP meeting no such school had yet been identified and the parties were unaware whether such a school even existed. The parents maintained that the two day schools suggested during the IEP meeting could not provide for the student's specialized needs. The Fourth Circuit emphasized "we do not hold today that a school district could never offer a FAPE without identifying a particular location at which the special education services are expected to be provided."[113] But at least in the Fourth Circuit, when a district proposes to move a student to a less restrictive setting—i.e. from a residential to a day school—*A.K.* holds that an appropriate location should be ascertained. Here, in contrast, the IEP team all agreed that M.G. needed a more restrictive setting—a residential placement—to meet his specialized needs.

In *Rachel H. v. Department of Education Hawaii*, the Ninth Circuit interpreted the

---

[111] *Id.* at 679 (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(VII)).

[112] *Id.* at 681.

[113] *Id.*

meaning of "location" under the IDEA.[114]  In *Rachel H.*, the school district offered to implement the student's IEP "on a public school campus."[115]  The precise school was not identified; however, the parties all understood "a public school campus" to mean a particular high school near the student's home.  The father later informed the school district that the family was moving and the original high school was too far away.  The district requested the student's new address in order to determine which public school would be appropriate, but the father did not provide this information despite numerous inquiries by the school district. The father then enrolled his daughter in a private school and requested a due process hearing, arguing that the failure to include the specific school in the IEP denied the student a FAPE.  The district court ruled for the school district, "reasoning that an IEP need not necessarily identify a specific school where it would be implemented to comply with the IDEA."[116]

On appeal, the Ninth Circuit affirmed.  It analyzed the meaning of "location" and discussed that shortly after the location requirement was added to the IDEA, the United States Department of Education had clarified that "location means the general setting in which [special education] services will be provided and not a particular school or facility" and the location of services as it relates to the IEP "generally refers to the type of environment that is the appropriate place for provision of the service."[117]  The Circuit

---

[114] 868 F.3d 1085 (9th Cir. 2017).

[115] *Id.* at 1087.

[116] *Id.* at 1088.

[117] *Id.* at 1090 (quoting Assistance to States for the Education of Children with Disabilities, 64 Fed. Reg. 12,406, 12,594 (Mar. 12, 1999)).

noted that "knowledge of a particular school, classroom, or teacher may well be relevant to allowing parents to participate meaningfully in the IEP process" and that failing to identify a school could result in a denial of a FAPE, particularly when the parents need the information to evaluate "whether a proposed IEP satisfies the IDEA because of a particular special education need caused by a child's disability."[118] However, the Circuit held "an educational agency does not commit a per se violation of the IDEA by not specifying the anticipated school where special education services will be delivered within a child's IEP."[119] The Circuit held that Rachel H.'s IEP was valid even though it did not specify a particular high school because had the father provided the school district with the student's new address, the student would have had a public school to attend, which would have provided the student with a FAPE.

In this case, the May 2016 IEP did not specify a particular school for M.G, but there was unanimous consensus, including Parents, that "[t]he nature and severity of [M.G.]'s disability justifies residential placement as the least restrictive environment." There was also unanimous consensus that "the location [would] be administratively determined."[120] At the time of the May 2016 IEP meeting, the parties were all aware that M.G. had been evaluated at Perkins and that Perkins was a potential residential placement for M.G. Moreover, at the subsequent June 2016 IEP team meeting, the team discussed several

---

[118] *Id.* at 1090.

[119] *Id.* at 1092.

[120] R. 197.

residential schools as possible placements, including Perkins.[121]   Here, the May 2016

IEP is valid because it clearly identified the type of environment in which special education

services would be provided to M.G.—a residential placement.

For the foregoing reasons, the Court finds that the May 2016 IEP was enforceable

insofar as it specified a residential placement for M.G.[122]   Because a residential

placement was not effectuated until May 2017, the Hearing Officer did not err in finding

that ASD failed to implement M.G.'s May 2016 IEP in a timely manner.

2. Precluding Further Evaluations of M.G.

ASD next asserts that "[t]he Hearing Officer erred by barring ASD from updating

M.G.'s ESER and IEP with present-level baseline data to determine his current adaptive

and behavioral needs."[123]   ASD maintains that the Hearing Officer failed to consider the

"specific right of a school district to conduct evaluations upon notice of parents' intent to

unilaterally place [the student] in private school."[124]   Parents respond that "[f]urther

evaluations were not appropriate because the results of any such evaluation would have

---

[121] R. 4122; R. 4194–4209.

[122] ASD also argues that Parents had predetermined Perkins as M.G.'s placement and did not meaningfully participate in updating M.G.'s May 2016 IEP.  Docket 81 at 13.  Although Parents had already filled out admission paperwork and were in contact with Perkins as early as September 2015, these facts do not invalidate the IEP team's May 2016 decision for residential placement.  Moreover, it appears from the record that ASD was also considering Perkins in June and July 2016 until it discovered the cost of tuition and that Perkins did not accept Medicaid.  R. 3492–93.

[123] Docket 82-1 at 38.

[124] Docket 82-1 at 39–41 (citing *Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462 (7th Cir. 2006)).

no bearing on the claims Parents raised in their due process complaint."[125]

The Hearing Officer denied ASD's prehearing Motion to Continue Evaluations, finding the following:

> The delay and necessity of these additional evaluations has not been sufficiently explained. The[re] appears to have been ample opportunity for the district to request and perform the evaluations prior to this latest request. The reluctance of the [] mother to go forward with the additional evaluations is troubling but the IEP team had agreed on the residential placement in June 2016. That is what is being considered at this hearing. Any additional evaluations will undoubtedly delay the proceeding and it is essential that a decision either way is issued so that the student's educational plans can move forward.[126]

The Hearing Officer's decision that ASD failed to timely implement M.G.'s IEP also addressed the district's evaluations:

> ASD had had multiple opportunities to evaluate student prior to the fall of 2016 and immediately prior to the hearing. They had not evaluated him after their own staff found that he had failed a vision test in March 2015. They did not even inform parents so that they could have had him evaluated. They did not do an evaluation of student after they were supplied with the report of Dr. Arnold although Ms. Ackerman did from August of 2016 to April of 2017 a running evaluation of student although she did not inform parents of what she found until[] the IEP meeting in the spring of 2016. The IEP team did not suggest or request additional evaluations prior to the recommendation of the residential placement.[127]

The Seventh Circuit case cited by ASD, *Patricia P. v. Board of Education of Oak Park*, does not support ASD's argument.[128] In *Patricia P.*, the student's elementary school and school district conducted a two-day evaluation of the student and concluded that the

---

[125] Docket 68 at 36.

[126] R. 6075.

[127] Docket 10-1 at 15.

[128] 203 F.3d 462 (7th Cir. 2000).

student should be placed in a behavior disorder resource program. The student's mother disagreed and unilaterally enrolled her son in a residential special education school. She did not make her son available for an evaluation by the school district. The mother then sought reimbursement for the tuition under the IDEA. The Seventh Circuit held that "parents who, because of their failure to cooperate, do not allow a school district a reasonable opportunity to evaluate their disabled child, forfeit their claim for reimbursement for a unilateral private placement."[129] Because the mother had not cooperated with the school district in making her son available for evaluation and because she unilaterally placed the student in a residential school, the Seventh Circuit held she was not entitled to tuition reimbursement by the school district.

Here, Parents are not seeking tuition reimbursement from ASD. Although the October 18, 2016 letter Parents sent to ASD provides that they intend to withdraw M.G. from school and unilaterally place him at Perkins, M.G. did not actually begin attending Perkins until May 1, 2017.[130] Parents did not seek tuition reimbursement at the due process hearing and instead sought an order requiring ASD to pay the cost of M.G.'s tuition beginning May 1, 2017.[131] The Hearing Officer granted Parents' request on May 30, 2017. Therefore, whether Parents are entitled to reimbursement is not at issue because they did not incur tuition expenses for M.G.'s education at Perkins.[132]

---

[129] 203 F.3d at 469.

[130] R. 2692–2701; Docket 10-1 at 4.

[131] *See* Docket 10-1 at 4.

[132] It is unclear whether Parents paid a deposit to Perkins and obtained reimbursement for that amount. *See* Docket 10-1 at 15.

The Court also agrees with the Hearing Officer's finding that ASD had ample opportunities to evaluate M.G. ASD first learned of M.G.'s visual impairment in March 2015 and learned of the seriousness of the impairment after Dr. Arnold's diagnosis in August 2015.[133] However, ASD did not itself conduct evaluations during the entire 2015-2016 school year, apart from the functional vision assessment by the BVI teacher in the fall of 2015.[134] It was not until after Parents gave notification of their withdrawal of M.G. from ASD that the district requested evaluations of M.G in October 2016.[135] Parents promptly consented to the FBA evaluation in October. But ASD then requested far more extensive evaluations and did not provide justification or a PWN explaining why those additional evaluations were necessary.[136]

ASD asserts it sought the additional evaluations in order "to make appropriate recommendations to the Hearing Officer about an in-district placement."[137] However, an in-district placement would have been at odds with the May 2016 IEP, which specified residential placement. An IEP is "like a contract"; it is "a binding commitment" that "may not be changed unilaterally."[138] If ASD sought to amend the May 2016 IEP to an in-district

---

[133] R. 2282; R. 2005–08.

[134] R. 2374–77; R. 5419, 5450.

[135] *See* R. 156–57, R. 2700. ASD agreed to pay for the IEE by Perkins in March 2016 and received its extensive report in May 2016. R. 2397; R. 2437.

[136] R. 1569; R. 2812–13.

[137] Docket 82-1 at 41.

[138] *M.C. by and through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1197 (9th Cir. 2017).

placement, it needed to seek the consent from Parents to do so.[139] "Absent such consent, the District was bound by the IEP as written unless it sought to re-open the IEP process and proposed a different IEP."[140] ASD did not follow these procedural steps. Therefore, further evaluations to support an in-district placement were unwarranted in March 2017. Accordingly, the Hearing Officer did not err in barring ASD from obtaining further evaluations of M.G.

3. Excluding Jennifer White's Recommendation

ASD maintains that "[t]he Hearing Officer erred when she prevented ASD from presenting expert testimony that it could provide for M.G.'s educational needs in an individually-designed in-district placement."[141] Parents respond that "Officer Gallagher correctly ruled that the District should not be allowed to contradict the IEP's call for residential placement."[142]

ASD retained Jennifer White, a special education consultant, who conducted an evaluation of M.G. in October 2016 based on five hours of observation of M.G. Parents moved to exclude "the District from arguing, or taking testimony from Ms. White and any

---

[139] *Id.* ("If the District discovered that the IEP did not reflect its understanding of the parties' agreement, it was required to notify [student's mother] and seek her consent for any amendment."); *see also Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) ("IEPs are clearly binding under the IDEA, and the proper course for a school that wishes to make material changes to an IEP is to reconvene the IEP team pursuant to the statute— not to decide on its own no longer to implement part or all of the IEP.").

[140] *M.C.*, 858 F.3d at 1197.

[141] Docket 82-1 at 47; R. 445–46.

[142] Docket 68 at 40.

other witnesses . . . that M.G. does not need a residential placement."[143]

The Hearing Officer discussed the motion on the record. She noted that most of Ms. White's report discussed information that was already introduced into evidence and Parents only objected to the summary and recommendations section.[144] She struck that section of the report.[145] It is somewhat unclear from the record the Hearing Officer's reasoning for granting the motion. Nonetheless, the IEP team had all agreed that residential placement was appropriate for M.G. and Parents had not questioned that determination in their due process complaint. As discussed above, the May 2016 IEP residential placement determination was binding on the parties. Accordingly, the Hearing Officer did not err in granting the motion *in limine* to exclude Ms. White's opinion that residential placement for M.G. was not appropriate.[146] Such evidence would not have been relevant in light of the May 2016 IEP.[147]

4. Finding Perkins to be an Appropriate Placement

ASD asserts that "[t]he Hearing Officer erred when she framed the issue to be decided at the hearing as 'Is Perkins an appropriate placement?' as opposed to reviewing

---

[143] R. 6082.

[144] R. 3952.

[145] R. 3953–54; *see also* R. 445–46.

[146] Even if the Hearing Officer erred in granting the motion, the Court has reviewed the stricken portion of the report and any error made by the Hearing Officer in this regard would have been harmless error. *See also* R. 7151–58 (Affidavit of Jennifer White).

[147] ASD also maintains that had Ms. White's recommendation been included in the record, it would have established that ASD did not fail to "timely implement" the IEP because residential placement was no longer appropriate. Docket 82-1 at 49. However, as discussed above, the residential placement determination in the May 2016 IEP was binding on the parties at the due process hearing.

applicable case law when parents make a unilateral placement."[148]  Parents respond that

the Hearing Officer "correctly determined that ASD failed to timely implement M.G.'s IEP

and that Perkins was the appropriate placement."[149]

The Hearing Officer found that "ASD failed to implement student's IEP in a timely

manner by not selecting a safe and appropriate residential placement."[150]  The Court

agrees.  In May 2016, the IEP team "reached full consensus on residential placement"

because of the "nature and severity of student's disability."[151]  M.G.'s mother testified that

at the end of the June 2016 meeting, she believed the IEP team had agreed that Perkins

was the best placement for M.G.[152]  However, ASD appeared to change its position when

it learned of the high cost of Perkins' tuition and that Perkins was not Medicaid eligible.[153]

By October 2016, when Parents announced their withdrawal of M.G. from the district,

ASD had not selected a residential placement.[154]

The Hearing Officer also carefully considered the evidence in determining that

---

[148] Docket 82-1 at 53.

[149] Docket 68 at 42.  ASD asserts that the Hearing Officer erred in not applying the *Burlington/Carter* test in determining whether Parents are entitled to tuition reimbursement. Docket 82-1 at 53 (citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence Cnty. Dist. Four v. Carter*, 510 U.S. 7 (1993)).  However, this is not a tuition reimbursement case because M.G.'s residential placement was delayed until May 2017, and Parents did not seek tuition reimbursement. *See supra* notes 129–31 and accompanying text. Therefore, the test does not apply.

[150] Docket 10-1 at 15.

[151] R. 198.

[152] R. 4206–09.

[153] R. 3492–93.

[154] *See* R. 2692–2701.

Perkins was the only appropriate residential placement for M.G.:

> Student is entitled to a free, appropriate education not the best education, not the Cadillac. If any of the other schools with the good programs, ie [sic] Arizona, Nebraska, Maryland had weekend residential or were equipped to handle student's problems (i.e. Arizona), Perkins would be disqualified because of its cost. But there are no other schools that provide all of the services that student needs and no other school where it has been demonstrated that he can be taught to live as a blind person in a seeing world and where he will be immersed 24/7 in that world. Perkins by the preponderance of the evidence presented will help him transit back to his home environment. All of the other schools referred to Perkins almost as the holy grail of a school for the blind who can also handle other disabilities. It is not only the best choice but in this very particular circumstance it is the only choice for this student.[155]

Officer Gallagher considered other schools besides Perkins, including Arizona School for the Blind, Maryland School for the Blind and Nebraska School for the Blind. However, the Hearing Officer ruled out these other residential placements because she determined each was unable to adequately support M.G.'s needs.[156] The Court has carefully considered the Hearing Officer's findings. Based on this Court's review of the record, the Court agrees with the Hearing Officer's finding, and finds by a preponderance of the evidence in the record as supplemented in this Court, that Perkins was the appropriate residential placement for M.G. The Hearing Officer did not err in finding that ASD failed to timely implement M.G.'s IEP and that Perkins was the appropriate placement for M.G. under the IDEA.[157]

---

[155] Docket 10-1 at 14.

[156] Docket 10-1 at 13–14.

[157] ASD also suggests that Parents failed to cooperate in selecting a residential placement. *See* Docket 82-1 at 23–24. The Court finds that Parents adequately cooperated in trying to select a residential placement. Moreover, the Ninth Circuit has held that "participating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the

5. <u>Post-Hearing Communication</u>

ASD maintains that "Parents and Perkins refuse ASD access to M.G. and refuse to cooperate with the Hearing Officer's Order."[158]  Perkins' staff testified to the Hearing Officer that they are committed to transitioning their students back to their home environment and have a process for succeeding in that regard.[159]  With the benefit of the evidence of this past year, the Court is considerably more skeptical than the Hearing Officer as to Perkins' willingness and ability to do so.  The Court's Order on Motion for Clarification of Stay Put Order is intended to ensure that cooperation takes place, so that ASD is able to provide M.G. a FAPE during the pendency of this litigation.

**ORDER**

For the reasons provided above, Hearing Officer Gallagher's May 30, 2017

---

parents." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055 (9th Cir. 2012).

ASD also asserts that "Parents predetermined that residential placement was appropriate during the May 2016 meeting."  Docket 81 at 11.  The case ASD cites to, *K.D. ex rel. C.L. v. Dep't of Educ., Hawaii*, provides "[a] school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement."  665 F.3d 1110, 1123 (9th Cir. 2011).  The student argued that the school district in *K.D.* had predetermined that a particular school was appropriate; however, the Ninth Circuit held that the school district had adequately considered other options. In this case, ASD argues that Parents predetermined the placement, not the school district.

ASD maintains that it is only responsible for costs associated with the educational needs of M.G. and is not responsible for weekend residential services.  Docket 81 at 28.  "For purposes of the IDEA, the term 'free appropriate public education' is defined to include 'special education' and 'related services.' 'Related services' in turn are defined by statute as such development, corrective, and other supported services as may be required to assist a handicapped child to benefit from special education."  *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1467 (9th Cir. 1996) (internal quotation omitted) (citing *Taylor v. Honig*, 910 F.2d 627, 629 (9th Cir. 1990)).  "Related services" in this case includes M.G.'s weekend services at Perkins.

[158] Docket 82-1 at 51.

[159] R. 3733–34 (Testimony of Perkins' Staff) (responding "[w]e would absolutely relish that" when asked whether Perkins is "willing to maintain contact with [M.G.'s] local school district").

decision is AFFIRMED.  ASD's Motion for Summary Judgment at Docket 82 is DENIED.

The Clerk of Court is directed to enter a final judgment accordingly.[160]

DATED this 15th day of June, 2018 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[160] The Court will retain jurisdiction to "suspend, modify, restore, or grant" the terms of the stay put order pursuant to Federal Rule of Civil Procedure 62(c).  *See* Order on Motion for Clarification issued on this same date.